| 55 | 250 |
|---|---|
| 55 | 605 |
| 55 | 250 |
| 57 | 723 |
| 55 | 250 |
| 58 | 240 |
| 55 | 250 |
| f73 | 489 |

JOHN J. HARTER, *as Administrator of the Estate of Patrick J. Sweeney, deceased,* v. THE ATCHISON, TOPEKA & SANTA FE RAILROAD COMPANY.

1. DEMURRER TO EVIDENCE, *When to be Overruled.* Where the evidence introduced by the plaintiff, though weak and inconclusive, fairly tends to establish every fact essential to the plaintiff's cause of action, a demurrer to the evidence should be overruled.

2. ——— *Error.* On an examination of the testimony in this case, the action of the court sustaining a demurrer to the plaintiff's evidence is *held* to be erroneous.

*Error from Shawnee District Court.*

THE nature of this action and all the material facts appear in the opinion herein, filed January 5, 1895.

*Bradford & Huron*, and *David Overmyer*, for plaintiff in error.

*A. A. Hurd*, and *Robert Dunlap*, for defendant in error.

The opinion of the court was delivered by

Allen, J.: This action was brought by John J. Harter, as administrator of Patrick J. Sweeney, against the Atchison, Topeka & Santa Fe Railroad Company, to recover damages for injuries causing the death of said Sweeney. It appears that the deceased was employed by the defendant as a switchman in its yards at Topeka; that while so employed, on the 26th day of May, 1887, he was riding on the foot-board in front of a switch-engine; that in passing over a switch the engine became derailed; that he jumped off in front of the engine to get out of the way; that the foot-board caught his heel; that he was thrown down, slid along on the ground, and so crushed that he died on the 28th of June following, from the effects of the injuries received. The district court sustained a demurrer to the plaintiff's evidence. The correctness of this ruling is challenged.

The only question for our consideration is whether there was any evidence tending to prove culpable negligence on the part of the defendant causing the injury which resulted in Sweeney's death. The accident was caused by the movable rail at a switch passing by the stationary rail so as to form what is called a "lip." The flange of the engine struck the end of the stationary rail, passed on top of it, and slid off on the outer side. It is charged in the petition that the switch and track at the place where the accident occurred were worn out, defective, and insufficient, and that

the engineer was negligent in running at a dangerous rate of speed. There is no question under the evidence as to the fact that the accident was caused by the lip formed at the switch, and that the movable rail was thrown so far as to bring it out of line with the stationary rail to the extent of about half its width. Briefly stated, the evidence offered to show that the switch and track at the point where the accident happened were out of repair, and that the defendant knew, or could have known by exercising reasonable diligence, of its defective condition, is as follows: Pat. McTague, a switchman, testified:

"Ques. What was the condition of these rails at the time in reference to being good, or old, or worn-out? Ans. It was an old track—a track very little used.

"Q. What was the condition of the switch? A. The switch, sir, was out of repair.

"Q. Now, state whether or not the switch would throw that track so as to make it smooth—so as to make it a smooth track? A. It could have been fixed. The switch could have been fixed so as to throw these rails so they would meet even, but the switch-stand must have been loose. [Objection.]

"Q. I will ask you whether or not if the switch-stand, and all of the machinery of the switch were properly constructed and in proper repair and condition, would throw the switch so as to make a smooth track? A. Yes, sir; if everything was in proper repair and good condition the track would be even. It would make an even joint."

On cross-examination this witness testified that he did not know anything about the condition of that switch prior to the accident.

Jacob C. Eversole, fireman of the switch-engine, testified:

"Q. You said that this switch worked hard in the morning. Did you throw the switch in the morning?

A. I could not say whether I did or not. We all throw them; whichever comes the handiest.

"Q. You say it did work hard? A. Yes, sir; but I could not tell which one threw it.

"Q. If that switch was in proper condition would the swinging motion of the engine, or any other motion, throw it out of position half the distance or width of the rail? A. No, sir; it would not.

"Q. Do you know whether or not the switch was repaired immediately after this accident? A. They worked on the switch afterward, but my attention was called to Mr. Sweeney in getting him. I cannot say the time they repaired the switch.

"Q. It was while you were getting him home? A. Yes, sir.

"Q. Do you know what these repairs consisted of? A. They consisted of some new spikes in the head-chairs—what we call head-chairs.

"Q. What effect did the putting in of these new spikes have on that switch? A. To fetch it into line with the rail, making it solid or stationary.

"Q. It would hold it in position? A. Yes, sir.

"Q. State whether or not there were any spikes in there, where the new spikes were placed. A. I cannot say whether there was or not.

"Q. Was there any person or persons employed by the Santa Fe railroad company at that time whose special duties it was to inspect the tracks, or see that they were in proper repair? A. Yes; they had a man for that purpose.

"Q. Was that a part of the duties of a switchman? A. No, sir; we had nothing to do with keeping the track in repair."

It appears from the testimony that the ends of the rails at the switch rest on an iron plate called a "head-chair," the stationary rails being let into slots to hold them firmly, and that part of the plate being smooth over which the movable rail slides. This witness further testified:

"Q. It was this chair or little plate under the tracks that you call a 'head-chair?' A. Yes, sir.

"Q. That was fastened down with spikes as you say? A. Yes, sir.

"Q. Judge Huron has asked you if these little pieces that were at the sides of the rails to prevent the sliding of the track too far were to get out of place, whether the movable track would remain in place. It is the design that everything shall be tight, and that the movable track shall fit up nicely to the stationary track? A. Yes, sir.

"Q. So that if everything is in place and sound and tight the track will match, and there will be no such thing as a lip? A. Yes, sir.

"Q. A lip could result as well from the moving of the head-chair as from the breaking of the taps? A. Yes, sir.

"Q. The spikes driven in are driven through for the purpose of holding the head-chairs solid? A. Yes, sir; the spikes are put in to hold the head-chair down."

John Nelson, a switchman employed in the same yard, testified:

"Q. State to the jury what were the facts at the time of this accident as to whether or not the switch-rod had gone by the rail, if you know. A. The switch-rod had gone by one rail, and the sliding bar had gone by the other.

"Q. The sliding rail had gone by the stationary rail? A. Yes, sir; in the shape of these pencils [indicating], about half a rail.

"Q. Suppose the head-chair had been in proper shape? A. There should have been a standard up here [indicating], so the rail could not have gone by.

"Q. It could not? A. Not if in proper shape.

"Q. Now, the head-chair is attached firmly to the head-block? A. Yes, sir.

"Q. So if it is properly attached it cannot move? A. No, sir.

"Q. Suppose the head-chair got loose, then what would occur? A. It might twist around on this end, throw this knob around, and make a bad joint on the two rails.

"Q. What is the head-chair fastened to the switch-block with? A. It is supposed to have four holes through it, and is blocked with spikes.

"Q. State whether or not you know the condition of this track at the time of the accident? A. I could not state. I had used the track. I do not think I had used it that day; but I would not be positive, but I know when I used it before that the engine most always made a quick turn when it struck the splice of the side-rail, or stationary rail. When the front driver of the engine would strike it the engine would jump to one side.

"Q. What caused the engine to do that, if you know? A. I observed that in throwing this slide-rail there was no curve to the slide-rail, and very little curve from the blocks to the end of the slide-rail, leaving that almost straight, and the curve of the stationary rail started right out at the head-chair, running straight on the slide-rail and striking that rail straight, it should turn and follow the rail.

"Q. Had you mentioned the fact of this defect in the track or switch at this point to the proper person employed by the company to look after the track? A. No, sir; I got over it, and that was all I cared for.

"Q. How long, in your best judgment, was this before this accident happened in which Sweeney was hurt? A. I did not pay any particular attention to it, and therefore I cannot tell.

"Q. Was within a day or two? A. Yes, sir; it was within a day or two — two or three days."

Andrew Varlin, the engineer of the switch-engine, testified that the engine was going between six and eight miles an hour at the time it left the track. The witnesses estimated the distance that it ran past the switch all the way from 25 to 50 feet. No witness testified to having examined the switch prior to the accident. There is no direct evidence showing in what particulars the switch was defective prior to the accident, nor is any express notice of a defect brought

home to the defendant, or to any employee whose duty it was to see that the track was in proper repair.

In this state of the case, it is strenuously insisted on behalf of the defendant that the cases of the *A. T. & S. F. Rld. Co. v. Wagner*, 33 Kas. 660; *A. T. & S. F. Rld. Co. v. Ledbetter*, 34 id. 326, are in point, and are controlling authorities. On the other hand, it is said that negligence may be proven by circumstances without direct evidence as to the minute particulars constituting it. In the case of *A. T. & S. F. Rld. Co. v. Stanford*, 12 Kas. 354, 372, it was said in the opinion, delivered by Mr. Justice VALENTINE:

"When the plaintiff has shown that one of the defendant's engines has caused one or more fires, and that the ordinary working of an engine under like circumstances does not ordinarily produce such a result, or that engines properly constructed, in proper condition, and properly managed, do not ordinarily under like circumstances produce such a result, then we think the plaintiff has made out a *prima facie* case of negligence; then we think the plaintiff has done enough to require the defendant to show that its engines are properly constructed, in good order, and properly managed."

See, also, *A. T. & S. F. Rld. Co. v. Bales*, 16 Kas. 252. None of the cases mentioned are exactly like this. The two latter cases were both to recover damages from fires alleged to have been caused by defective engines, and the fact was commented on by this court that knowledge as to the particular defects was not within the reach of the plaintiff, and that it would be unreasonable to require in all cases proof of a definite and specific defect. In the *Wagner Case*, the fact is commented on that the plaintiff had full knowledge of the defect at the time he incurred the risk which resulted in the injury, and it was not shown that any

other person had any notice or knowledge of it, and it is said in the opinion that it is doubtful whether there was in fact any such defect as was claimed. The *Ledbetter Case* is altogether dissimilar from this. In that case the court seems to have regarded the injuries as somewhat mythical, and the defect in the cars as not satisfactorily shown. In this case it is very clearly shown, both that the plaintiff's intestate lost his life and that it was caused by a defective joint in the rails at the switch. The weakness in the testimony is with reference to the existence of the defect prior to the accident and knowledge brought home to the defendant of such defect, or of the fact of its existence for such length of time that notice is to be presumed. The evidence showing that repairs were made immediately after the accident tended to show that a defect existed in the fastenings of the switch-chair to the head-block, and the driving of new spikes through the chair tended to prove that it was loose. Under the cases decided by this court, cited by the plaintiff in error, namely, *A. T. & S. F. Rld. Co. v. Retford*, 18 Kas. 248; *City of Emporia v. Schmidling*, 33 id. 485; *St. L. & S. F. Rly. Co. v. Weaver*, 35 id. 412; *A. T. & S. F. Rld. Co. v. McKee*, 37 id. 603, this evidence was admissible for the purpose of showing that the defect existed at the time the repairs were made, but it did not show, nor tend to show, that the defendant had knowledge of the defect prior to the accident. There being evidence then showing that an accident happened, that it was occasioned by the movable rail of the switch being thrown out of line with the stationary rail, thus forming a lip over which the flange of the engine passed to the top of the rail and then to the ground, and also that the chair was out of repair; it

also being shown that if the chair was in its proper place, firmly fastened, and in proper order, such a lip could not have been formed, a clear showing of a defect in the track along which the switch-engine was to pass is made. This, however, is not enough to warrant a recovery against the defendant. There must be evidence fairly tending to show either that the defendant knew of the existence of the defect, or that, in the exercise of reasonable and ordinary care and diligence, the defect could have been discovered before the accident. The switch and all parts of the track connected with it were open to inspection. The evidence of McTague was that it was out of repair. The evidence of Nelson is that the engine most always made a quick turn when it struck the splice of the rails, and that this had been the case for two or three days; of Eversole, that the switch worked hard that morning. Different minds might be differently impressed by these facts. It is not our province to declare as a matter of law just how frequently inspections should be made, nor to express any opinion as to whether under the proof the plaintiff ought to recover. We have only to determine whether there is evidence which should have been submitted to the consideration of the jury. While there is no evidence showing that the defendant company, or its proper agents, had actual knowledge of the defect, we think there is some evidence tending to show that by the exercise of ordinary care the defect could have been discovered and remedied prior to the accident. In this view of the case it is unnecessary to consider the question as to whether the engineer was negligent in running at too great speed.

2. Error.

The rule that upon a demurrer to the evidence the

court will not weigh conflicting testimony, but that, if there is any competent testimony tending to support every material averment of the plaintiff's petition, the case must be submitted to the jury, is too well established to require comment, or the citation of numerous authorities. (*Merket v. Smith*, 33 Kas. 66; *K. C. Ft. S. & G. Rld. Co. v. Cravens*, 43 id. 650; *Benninghoff v. Cubbison*, 45 id. 621.)

1 Demurrer to evidence, when to be overruled.

The order of the court sustaining the demurrer to the plaintiff's evidence is reversed, and the cause remanded for a new trial.

JOHNSTON, J., concurring.

HORTON, C. J., dissenting.