Argued April 2, decided April 22, 1913.

# FOSTER *v.* UNIVERSITY LUMBER CO.*

(131 Pac. 736.)

**Appeal and Error—Questions of Fact—Conclusiveness of Verdict.**

1. Under Constitution, Article VII, Section 3, as amended November 8, 1910 (see Laws 1911, p. 7), declaring that no fact tried by a jury shall be otherwise re-examined, unless the court can affirmatively say there is no evidence to support the verdict, evidence *held* sufficient to go to the jury on the issue whether plaintiff's release of his claim for damages from an accident while in defendant's employ was signed while he was in no condition, by reason of sickness and pain, to read or understand the contents of the paper signed by him, that he did not intend to release his claim against the employer, and that the release so procured was unfair and fraudulent, so that the jury's finding on such issues could not be disturbed on appeal.

**Contracts—Release—Validity—Estoppel.**

2. Under ordinary circumstances, one is not excused from the consequences of signing a paper, as a release, which he has negligently failed to read.

[As to contracts signed in ignorance of contents, see note in 138 Am. St. Rep. 810.]

**Appeal and Error—Questions of Fact—Verdict.**

3. A party's statement of fact accepted by the jury must be taken as true on appeal by the other party.

---

*As to the admissibility of evidence of condition, before and after accident, of property whose defects are alleged to have caused injury, see note in 32 L. R. A. (N. S.) 1084.—REPORTER.

Negligence—Action for Injuries—Admissibility of Evidence—Subsequent Repairs—Condition at and After Injury.

4.  While evidence of subsequent repairs and improvements is inadmissible to show previous negligence, yet, where the jury has been permitted to view the machinery, evidence that it has been repaired or altered subsequent to the accident is admissible to show its condition at the time of the accident.

Appeal and Error—Admissibility of Evidence—Necessity of Specific Objection.

5.  A defendant who objected generally to the admissibility of evidence competent for certain purposes but not for others, and who requested no limitation as to its effect, cannot on appeal complain of its admission.

Pleading—Cure by Verdict—Reply.

6.  A replication in a servant's action for injuries, denying the execution of the release set up by the answer, and alleging that fellow-workmen subscribed money for him after his injury, and that defendant's manager agreed to assist them to the same extent, and that, while he was suffering from his injury, he was directed to see the manager and receive the money so subscribed, and that the manager requested him to sign a paper and falsely and fraudulently represented that it was a receipt for the money so subscribed by the employees and by himself, and would not release the company from damages, was sufficient, after verdict, to justify reception of evidence as to fraud in procuring the release.

Trial—Instructions—Construction as a Whole.

7.  An instruction that a master's duty as to a reasonably safe place and appliances for work is greater than that required of the servant, and he may be chargeable in certain circumstances with negligence in this respect in failing to ascertain a danger where a servant would not, while not to be commended if standing alone, yet is not objectionable when taken in connection with the entire charge fully and fairly presenting the issues.

Trial—Requested Instructions—Instructions Given.

8.  In a servant's action for injuries, the refusal to instruct for defendant that one cannot be heard to say that he did not know the contents of a release signed by him and which he had an opportunity to read was not error, where the court gave a general instruction that the release was regular upon its face and was presumed to have been executed in good faith, and that the burden of proving fraud was upon the plaintiff.

Appeal and Error—Review—Presumptions—Receiving Verdict in Absence of Court.

9.  Where it was agreed that a jury might return their sealed verdict to the bailiff and disperse, and no objection was made at the time such agreement was stated by the court or when the bailiff delivered the verdict to the court, nor until a motion for new trial was filed, it will be assumed that counsel consented to the separation of the jury and to the reception of the verdict in their absence.

[As to absence of court when verdict returned, see note in 122 Am. St. Rep. 726.]

From Multnomah: JOHN P. KAVANAUGH, Judge.

Statement by MR. CHIEF JUSTICE McBRIDE.

This is an action by Charles L. Foster against the University Lumber and Shingle Company, a corporation, to recover for personal injuries sustained by plaintiff. The complaint alleges, in substance: That plaintiff was employed by defendant as a sawyer in its shingle-mill. That defendant had placed in its mill a jointer saw, and had constructed and placed over and above the saw a guard for the purpose of preventing injury to the employees in and about the mill, and to prevent injury to the person by reason of coming in contact with the saw. That on November 12, 1910, while plaintiff was working at said machine, by reason of the crowded condition of the place where he was so working, he stumbled and reached for and placed his hand upon said guard to prevent himself from falling. That said guard was loose and moved and sprung over so that plaintiff's left hand went down upon the jointer saw, which was revolving at a rapid rate of speed, and thereby all the fingers and part of the thumb of his left hand were cut and severed from his hand, inflicting permanent injury. That the defendant carelessly and negligently failed and neglected to furnish a safe place and machinery for the plaintiff to work in and with upon the occasion referred to, in this: That the defendant carelessly and negligently failed to have the said guard properly fastened and secure at the time the said accident occurred, and carelessly and negligently suffered and allowed said guard to become loose and insecure and unsafe, and permitted the same to remain unsafe and insecure. That the defendant at and before the time of the said accident, by the exercise of reasonable diligence, ought to have known of the dangerous condition of the said saw and guard, and of the looseness of the said guard, and of its insecurity and un-

safeness, and that the defendant did have notice and
knowledge of the same, and that defendant carelessly
and negligently failed and neglected to notify or warn
or instruct or inform this plaintiff of the dangerous
condition of the said saw and guard or of any condi-
tion of the said guard or saw.   That the plaintiff had
no notice or knowledge of the existence of the danger-
ous condition of the said guard or that the same was
loose or insecure, but believed that the same was safe,
permanent and strong, and properly fastened.   De-
fendant answered, denying negligence on its part and
pleading contributory negligence and assumption of
risk by plaintiff, and also pleaded a written release by
plaintiff of all damages by reason of the accident.   By
way of reply plaintiff denied the execution of the re-
lease and further alleged as follows: "The plaintiff,
further replying to the said second and separate de-
fense herein, alleges that on or about the 19th day of
November, 1910, the employees in and about the mill
of the said defendant, by and on account of the injury
to the plaintiff, subscribed a sum of money for the
plaintiff and placed the same in the hands of J. Kroen-
ert, who is and was at said time the president and
general manager of the defendant.   That the said
Kroenert promised and agreed that he would assist
this plaintiff personally to the same extent as did the
employees, and that while this plaintiff was suffering
from the injuries to his left hand as set out in the com-
plaint herein, and while he was suffering from the
effects of the anesthetic administered to him at the
time of the amputation of the fingers from his left
hand, this plaintiff was ordered and directed to go to
the said J. Kroenert to receive the money so sub-
scribed.   That plaintiff went to the office of said
Kroenert.   That thereupon the said Kroenert re-
quested him to sign a paper, and falsely and fraudu-

lently and unlawfully, and with intent to deceive and defraud this plaintiff, represented that the said paper was a receipt for the money so subscribed by the employees and by himself, and that the same was not intended and would not release the company from the damages sustained by this plaintiff, and that the defendant would continually employ the plaintiff in and about the mill and premises and pay to him the sum of $75 each and every month as long as the mill continued to stand. That relying upon the representation so made, and being sick and ill as aforesaid, this plaintiff signed the pretended release."

After the evidence had been introduced defendant asked the following instructions, which were refused: "I instruct you that it is a general rule that the plaintiff cannot be heard to say that he did not know the contents of the release or the paper signed by him when he had an opportunity to read it. * * I instruct you to bring in your verdict in favor of the defendant." In instructing the jury, the court used the following language, which was excepted to by defendant: "The degree of care which the law requires of a master with reference to a reasonably safe place and to reasonably safe machinery and appliances is greater comparatively than that required of the servant, and the master may be chargeable in certain circumstances with negligence in this respect in failing to ascertain the danger where a servant would not." The court also gave the following direction to the jury: "It is agreed that, in case you return a verdict after I have left the courthouse, you may return a sealed verdict, and in that case all members of the jury agreeing must sign the verdict, and then you will hand it to the bailiff and then be discharged, and you may disperse to your homes, and, this being the last jury upon which you will sit, you will not be obliged to return." No objection was made to this direction. The jury found a majority verdict

against defendant for $6,000, which they sealed and delivered to the bailiff, as directed, and dispersed. The verdict so sealed was handed to the court the next morning, and, though opened and read in the presence of counsel for both parties, no objection was made to the absence of the jury nor to any irregularity in the reception of the verdict. Counsel for defendant asked and were granted 40 days in which to move for a new trial, and in said motion for the first time raised the objection, among others, that the verdict was not delivered in open court in the presence of the jury. The court rendered judgment upon the verdict in favor of plaintiff, and defendant appeals.        AFFIRMED.

For appellant there was a brief over the names of *Messrs. Wilbur, Spencer & Dibble,* with an oral argument by *Mr. Schuyler C. Spencer.*

For respondent there was a brief and oral arguments by *Mr. John Ditchburn* and *Mr. F. G. Wilhelm.*

Opinion by MR. CHIEF JUSTICE McBRIDE.

1. The first question arises upon the validity of the release executed by plaintiff. By the provisions of Article VII, Section 3 of the Constitution, as amended November 8, 1910 (see Laws 1911, p. 7), if there is any evidence to support the verdict, we are bound by the finding of the jury, and therefore we are to a great extent bound by the testimony of plaintiff upon this point.

This testimony is substantially that one Porteous, the night foreman of the mill, visited him shortly after the accident, identified himself as a brother in the same secret order, and advised him not to sue the company, telling him that he had not a witness in the world, and intimating that the company would do well by him. To this he made no reply. Upon the day the release was

signed, Porteous came again, and the witness gives the following account of what occurred:

"A. He came down to my house and wanted to know how I was, and I told him. He says, 'The old man wants to know why you don't come down to the office.' I told him I had no business down to the office that I knew of. He says, 'Well, the boys made up quite a purse for you.' I says, 'Is that so?' He says, 'Yes, they made up $192. I have got it here in my pocket, but I have it with some other papers so I won't give it to you; I will wait and you will have to come down to the office this afternoon, because the old man wants to see you anyway.' I went down to the office that afternoon.

"Q. Now, state to the jury what occurred there at that time?

"A. I went into the office and bid Mr. Kroenert the time of day. He wanted to know how I was feeling. I told him.

"Q. What did you tell him?

"A. I told him I was sick and suffering more pain than I really ought to under the conditions.

"Q. Were you under the care of a doctor at that time?

"A. Yes, sir; Dr. Moore had dressed it. I think it was the day before this that he dressed my hand.

"Q. In what shape were you in regard to the effects of the anesthetic?

"A. I was sick like an anesthetic makes anyone; sick at my stomach and vomited considerable.

"Q. Were you sick up to the time of this date that you went there?

"A. For a month after. I went to see Dr. Moore something like a month after.

"Q. When you went in there this afternoon what occurred; what did Mr. Kroenert say to you?

"A. He bid me the time of day; wanted to know how I was feeling, and I told him; I told him I was sick and I was suffering more pain than I really ought to. He says, 'I have a check here that the boys made up for you for $192.' He says, 'Now, I am going to give

you an allowance myself on that'; and he says, 'It will make you a nice little purse.' He says, 'That will carry you through until you are well'; and he wanted to know how I was hurt, and I told him.

"Q. What did you tell him?

"A. I told him I tripped up and put my hand on this guard, and apparently the guard was loose for it bent over when I put my hand on it and let me come down on the saw and cut my hand off. And he asked me if I would stay there for two or three minutes until he went out. I says, 'Yes.' He went out, and I did not have the time; I did not look at the time when he went out or when he came in, but it was not very long, and he came in with a tall dark-complexioned man I have never seen before, never seen since, and don't know who he was. And he sat down at his table. 'Now,' he says, 'look over that and sign it, and I will have Mrs. Somebody [I don't recollect her other name] write you out a check for $200'; and he says, 'I will give you a job as long as that mill runs, and I will see that you and your family will never want for nothing; if you are ever in want, I want you to come and tell me.' So I looked at the paper; I did not read much of it; I started in, and I turned around to him and I says, 'Is that in this paper?' He says, 'No, but you can take it for granted from me that it will be just as I am telling you that it will; you sign that and I will give you $200 more and you will never want for nothing.' I signed the paper and he had that man sign it, and he had the woman sign it; the woman stenographer at his place sign it; and that was all, and I took the money and left.

"Q. In what shape was that, the money he gave you and the check?

"A. There was a check from the men for $192, stating from the men, and there was a check stating from the company so much.

"Q. When did you cash those checks?

"A. I cashed those checks the next day.

"Q. [By juror.] How much did you say was the check from the company?

"A. $200.

"Q. How much did they make the total amount?

"A. $192 in the check and the day I received it my wife had received $2 in cash from Mr. Porteous.

"Q. No, you don't understand. You got a check for $200 from the company?

"A. Yes.

"Q. And what did you get from the men added to that made how much?

"A. That was $392.

"Q. They were in two separate amounts?

"A. Yes.

"Q. And you got $2 in cash?

"A. $2 in cash from Mr. Porteous that he left with my wife.

"Q. That was a part of the subscription from the men?

"A. Yes.

"Q. Now, was anything mentioned in any shape or form or manner at the time you say you signed this paper about it being a release?

"A. No, sir; not anything.

"Q. When did you again see Mr. Kroenert?

"A. I don't recollect exactly, but it was some days after that.

"Q. Under what circumstances?

"A. He told me if my hand kept on paining, or if my hand was not proceeding as I thought it was, to come and tell him.

"Q. Did you go and see him?

"A. I went and seen him and told him I was suffering more pain at that time than I ought to.

"Q. What was done?

"A. I don't know; he said no more."

On cross-examination the witness testified as follows:

"Q. And did not Mr. Kroenert hand you at this time this paper, which I now present to you, and which I will ask to have marked defendant's Exhibit C?

"A.   That is my signature.

"Q.   And this defendant's Exhibit C is the paper, is it not, that you signed at that time?

"A.   That is my signature on it.

"Q.   Well, that is the paper signed by you at that time?

"A.   Must be.

"Q.   Now, as a matter of fact, you took that and read it, did you not?

"A.   I did not.

"Q.   At that time?

"A.   I took it, but I did not read it.

"Q.   You say, then, you did not read it?

"A.   No, sir; I tried to read it; I glanced it over; and he says, 'You go ahead and sign that, and I will have Mrs. Crary [or whatever her name is] make out a check for $200.'

"Q.   You had it in your hands?

"A.   I had it in my hands.

"Q.   And glanced over it?

"A.   I glanced at it; I am not much of a reader; and it would take me some time to read it; and I am suffering pain, I was sick at the time; I could not content myself to stay there so long.

"Q.   You say you did not glance over it?

"A.   I just glanced at it, yes; and I asked him if the job was on that; that he said that I and my family would never want for nothing; I asked him if that was on it, and he says, 'No, but I will guarantee it is all right; you go ahead and sign it.'

"Q.   You had some conversation in the presence of these witnesses, didn't you?

"A.   That was it exactly.

"Q.   Didn't you have some conversation to this effect that Mr. Kroenert at the time asked you if it was perfectly satisfactory to you in the settlement of any matter you might have, and you stated to him, 'Yes, it was.'

"A.   The only time any settlement was made, when I seen this in this paper, was when Mr. Ditchburn read

it to me. They called it a release to release the company.

"Q. (Last question read.) In the presence of these witnesses who were there at that time?

"A. He asked me—

"Q. No, answer the question first.

"A. He handed me the checks, and after he handed me the checks he asked me if I was satisfied; I told him I was, to that extent. That was on this subscription they made up for me.

"Q. Did he not at that time, in speaking of the settlement of any possible claim you might have against them, ask you if you were entirely satisfied, and tell you, if it was all right, to sign it, and, if you were not satisfied, not to sign it?

"A. He did not; he did not.

"Q. You received at that time, did you not, this instrument here, which I will ask to have identified as defendant's Exhibit D?

"A. Yes, sir.

"Q. And that is your signature on the back of it?

"A. Yes, sir.

"Q. You signed this instrument which is marked defendant's Exhibit C on the 19th, did you not?

"A. If that was the first day I went down to see Mr. Kroenert, it was.

"Q. As I understand you, you told the jury that you deposited this check the next day.

"A. Yes.

"Q. At what bank?

"A. Bates' Bank on the east side.

"Q. As a matter of fact, this settlement was made on Saturday afternoon, and there were no banks open, and you did not deposit it the next day, the next day being Sunday, isn't that true?

"A. Yes, that is true. I deposited it on Monday morning; I kept it in my house over Sunday.

"Q. So that you took this check home with you, did you not, Saturday afternoon?

"A. Yes, sir.

"Q.   And you had it in your house with you on Sunday?

"A.   On Sunday, and I deposited it Monday morning in Bates' Bank, Monday forenoon.

"Q.   So that your memory was faulty when you said it was the next day?

"A.   I got that check after 3 o'clock.   Mr. Kroenert himself told me I had to keep it until Monday.

"Q.   What did you mean when you said you deposited it the next day?

"A.   Well, I supposed it was, because the first time the bank was opened I went and cashed it, and I supposed it was the next day.  °I have not got the dates of these things so I don't know.

"Q.   And during that afternoon and all the next day, which was Sunday, you had this check in your possession, which stated upon it, 'For an accident while at work during the evening of the 11th of November, 1910'?

"A.   I gave it to my wife as soon as I came home.

"Q.   But you had this check subject to your inspection so you and your wife could read it before it was cashed?

"A.   I had it there, but I was not reading checks then; I was caring for my hand.

"Q.   Mr. Kroenert was not there to prevent you from reading it?

"A.   He did not, but he had my hand in such a shape it prevented me; he set the trap.

"Q.   You had an anesthetic at the time your fingers were dressed and taken care of by Dr. Christmas?

"A.   I had an injection and then an anesthetic.

"Q.   Injected morphine into your arm?

"A.   Something, I don't know what it was.

"Q.   And then gave you an anesthetic at that time?

"A.   Yes, sir.

"Q.   What time in the morning was that anesthetic administered to you; you were hurt about 3 o'clock?

"A.   Well, it was about half or three-quarters, between a half an hour and an hour after I was cut.   I

sat in the office quite a long time before they got their instruments ready.

"Q.   So you took your anesthetic on or before 4 o'clock on the morning of the 12th?

"A.   I could not tell you just exactly what time it was—something after 3 o'clock.

"Q.   About 4 o'clock, because you were hurt about 3?

"A.   Yes.

"Q.   You say you were taken to St. Vincent's Hospital?

"A.   I was taken to St. Vincent's Hospital.

"Q.   Do you say that you were still under the influence of your anesthetic at the time you were in Mr. Kroenert's office on the 19th day of November, seven days after that?

"A.   Well, yes, pretty near a year after, and I am still; I have got it in my system yet.

"Q.   You have got that anesthetic in your system yet?

"A.   Yes, sir; I have.

"Q.   So that you are still not quite in your right senses?

"A.   I am in my right senses now at the present time, but my stomach is not through with it.

"Q.   Were you out of your senses on the 19th of November at the time that receipt was signed?

"A.   Almost from pain and sickness.

"Q.   From the anesthetic?

"A.   Yes, sir; and the pain in my hand.   There was affection in my hand, which the doctor admitted which caused me to suffer the pain.

"Q.   You were suffering from the pain and not the anesthetic then?

"A.   Both pain and anesthetic together.

"Q.   You were?

"A.   Yes.

"Q.   Seven days after this accident?

"A.   Yes, sir.

"Q. This other check which has been presented, and which counsel has called for, is that your signature?

"A. Yes.

"Q. Is that the other check that was handed to you?

"A. From the men for $192, yes.

"Q. From the men?

"A. I don't know whether it is from the men or not. The benefit from the day crew and the night crew, yes.

"Mr. Wilbur: I will offer this in evidence as defendant's Exhibit E.

"Received without objection and marked defendant's Exhibit E.

"Questions by the jurors:

"Q. Did you ever read these checks after you received them?

"A. No, I did not. I just looked at the amount on them and wrapped them up and went home and gave them to my wife and she opened them and looked at the amount and put them in our trunk.

"Q. Did she read them?

"A. No, she did not to my recollection.

"Q. Any discussion about them?

"A. No.

"Q. (By Mr. Wilbur, resuming.) Now, as to this defendant's Exhibit E, which is the check from the day crew and the night crew for $192, their benefit, as a matter of fact, was that check not given to you by Mr. Kroenert in his office on Friday, the day before you got this check and signed this paper?

"A. I got the two checks on the same day. This one and that one I got at the same time. I went home with them both the same time and cashed them both at the same time.

"Q. And you say you did not get this one on Friday?

"A. I got them both the same day.

"Q. Didn't you go down on Friday to have your hand dressed and at that time go and see Mr. Kroenert and get that one and then he said he would give you

the $200 if you would sign the release and you said you would?

"A.   He did not say nothing to me about a release.

"Q.   And you came back the next day and he gave you that?

"A.   No, sir; he did not.

"Q.   And both of these checks were in your possession?

"A.   At the same time.

"Q.   Over Sunday from Saturday afternoon?

"A.   Yes.

"Q.   With those statements on them of what they were for?

"A.   I did not read them; I just looked at the amount.

"Q.   You say he told you the question of this job was not in the paper?

"A.   Yes, he told me that was not in the paper.  I asked him if it was in the paper, and he said, 'No.'

"Q.   He told you it was not?

"A.   Yes, I asked him, 'Is that down in the paper?' And he said, 'No.'

"Q.   Did Mr. Kroenert read that release to you?

"A.   No, sir; he did not.

"Q.   Do you claim now that Mr. Kroenert misstated to you the contents of what that release was?

"A.   He did not state what it was.  He says, 'Sign this and I will have Mrs. Crary write you out a check for $200, and that will make you a nice little bunch of money.'  That is what he said.

"Q.   Then, as I understand, he did not tell you what was in that paper?

"A.   No, sir; he did not; never mentioned what was in it whatever.

"Q.   That was the only talk you had with him about that paper, which you signed, was whether or not the kind of job was in that and he told you it was not?

"A.   That was the only question that came up.

"Q.   So that, as a matter of fact, Mr. Kroenert did not deceive you when you signed that paper, did he?

"A.   He did not.

"Q.   He did not say anything to you what was in it, did he?

"A.   He did not say what was in it, no.

"Q.   So that, as I understand you to say, he did not represent to you what that paper was at all?

"A.   He did not."

On redirect examination plaintiff testified as follows:.

"Q.   Counsel asked you if Mr. Kroenert deceived you when you signed this paper?

"A.   Yes, he did.

"Q.   What had been your conversation prior to signing the paper?

"A.   He asked me how I felt; asked me how I was cut, and had me explain it; and he told me that the boys made up a check for me, a purse for me for $192, and he says, 'Now, I am going to go with them too, and that will make you a nice little bunch of money, and as soon as you are able to go to work you can come back and go to work.'   And he says, 'Now, I know you understand shingles thoroughly; you can take that inspection job; and, furthermore, I will see that you and your family will never want for nothing.' "

The check for $200 mentioned in the testimony was upon a printed form, except that the name of the payee, the amount, and the words, "For accident while at work during evening of 11th of November, 1910," were typewritten thereon as follows:

No. 18713.                              Portland, Oregon, Nov. 19, 1910.

To Merchants' National Bank, Portland, Oregon:

Pay to the order of C. Foster $200.00 Two Hundred & No/100 dollars.

[Not over Two Hundred $200$]

UNIVERSITY LUMBER & SHINGLE CO.,

Per A. J. KROENERT, Manager.

| Settlement of account below. | Endorsement of this voucher check constitutes acknowledgment by payee of full payment of account specified hereon.   Void if altered or erased in any way.   Return to payor if not correct. |
| --- | --- |
| . For accident while at work during evening of the 11th of Nov. 1910. | |

We think this furnishes sufficient evidence to go to the jury to sustain the contention that Porteous, acting for the company and under the direction of its manager, led plaintiff to believe that the company intended to give him a donation of $200, and that the manager allowed him to remain under that impression and hurried him into signing the release without explaining to him the contents.

2. It is true that under ordinary circumstances a man is not excused from the consequences of signing a paper which he has negligently failed to read; but this is not always the case. In the present instance the manager was his employer and apparently his sympathizing friend, and Porteous was his friend and a brother in the same secret order. He would naturally rely on their statements and would not be likely to suspect any attempt to overreach him. In addition it appears that he was sick and in great pain from his wounded hand, and in no condition to transact important business. While it is very unlikely that his mental and physical condition was the result of the anesthetic administered several days before, the fact that he was actually in the condition he described from some cause seems very probable. He is not to be branded as an intentional falsifier because he made a wrong diagnosis of the cause of his condition, a thing which persons skilled in the treatment of disease do every day.

3. Taking his statement as true, as we must, because the jury so accepted it, we conclude that he was in no condition to read and understand the contents of the paper signed by him; that he did not intend to release his claim against the company; and that the release procured under the circumstances was unfair and fraudulent. What our conclusion would be, sitting as. triers of fact and considering and weighing all the testimony, need not here be considered. The question

before us is not as to the weight of the testimony but as to whether there is any testimony to support plaintiff's contention. Releases obtained under circumstances similar to those detailed in plaintiff's testimony have frequently been disregarded or set aside by the courts: 6 Thompson, Neg., §§ 7376, 7377, and cases there cited; *Olston* v. *O. W. P. & Ry. Co.,* 52 Or. 343 (96 Pac. 1095, 97 Pac. 538, 20 L. R. A. (N. S.) 915); *Christianson* v. *Chicago St. P. Ry. Co.,* 67 Minn. 94 (69 N. W. 640). Nor can we agree with counsel that the transaction itself is devoid of any indication of overreaching and unfairness on the part of defendant. It is plainly the law that plaintiff had a right to compromise his claim for $200 or for $1 if he saw fit; but, whatever the circumstances bearing upon the probability that he would deliberately have done so, the practical loss of his hand was a fact then and always apparent to him. He knew that he was greatly and permanently injured. Anybody in his right mind would have known that, if entitled to any remuneration whatever, the sum of $200 would be ridiculous as a recompense. As a gratuity it might be thankfully accepted, as any sum so given, no doubt, would have been under these circumstances, but its gross inadequacy as compensation at once suggests the idea that it was received as charity. While this inadequacy may be but a slight circumstance tending to show that plaintiff did not know or realize that he was releasing a valuable claim for substantial damages, it is one entitled to consideration. The whole matter as the testimony leaves it was a question of fact for the jury, and not of law for the court.

4. The admission of the testimony of A. L. Bullis tending to show that a few hours after the accident Olafson, defendant's foreman, was seen to tighten up the bolts on the sawguard and put in a new bolt is alleged as error. The authorities almost universally agree

that evidence of subsequent repairs and improvements cannot be admitted to show previous negligence: *Skottowe* v. *Oregon S. L. Ry. Co.,* 22 Or. 438 (30 Pac. 224, 16 L. R. A. 596) ; *Love* v. *Chambers L. Co.,* 64 Or. 129 (129 Pac. 492) ; *Columbia & P. S. R. Co.* v. *Hawthorne,* 144 U. S. 202 (12 Sup. Ct. Rep. 591, 36 L. Ed. 405). But it does not follow that, because such evidence is inadmissible for the purpose of showing negligence, it is always inadmissible for any purpose. Thus, as pointed out in *Love* v. *Chambers L. Co.,* 64 Or. 129 (129 Pac. 492), where it is claimed by the defendant that certain · safeguards alleged by plaintiff to have been necessary could not be used without impairing the efficiency of the machinery, evidence that subsequent to the injury such safeguards were provided and actually used without any detriment to the operation of the machinery was admissible. Another ground, well established by reason and authority, is, in those cases where the jury has been permitted to view the machine, evidence is admissible to show that such machine has been repaired or altered subsequent to the accident: *Marien* v. *M. J. Walsh & Co.,* 64 Or. 583 (131 Pac. 505). The evidence here objected to would seem to come fairly within this exception. Another equally well-established ground upon which such testimony may be admitted arises in those cases where the actual condition of the machinery, or other appliance, causing the accident is a question in dispute. In these cases such evidence is admitted, not to show knowledge of the defect on the part of the defendant or to show negligence in failure to repair or guard the machinery, but to show the actual condition at the time the accident happened: *Brennan* v. *Lachat,* 5 N. Y. St. Rep. 882; *Louisville & N. R. Co.* v. *Malone,* 109 Ala. 509 (20 South. 33; cited in 42 L. R. A. 762, note) ; *Texas & N. O. R. Co.* v. *Anderson* (Tex. Civ. App.), 61 S. W. 424; *Kuhn* v. *Illinois Cent. R. R. Co.,* 111 Ill. App. 323; *City of Emporia* v.

*Schmidling,* 33 Kan. 485 (6 Pac. 893) ; *Harter* v. *Atchison,* 55 Kan. 250 (38 Pac. 778).   In *Brennan* v. *Lachat,* 5 N. Y. St. Rep. 882, the court says:

"The evidence was clearly competent as tending to show that defendant had removed the cause of the accident.   The cases cited by appellant are all cases where it was attempted to be shown that after an accident a different or perhaps safer mode of structure, or preventive, or a different mode of conveyance or rate of speed was adopted after an accident, except in the case in ·31 Hun, where it was attempted to be shown that, some months after an accident happened in the hallway of a tenement house by reason of a defective oil-cloth covering, the landlord put down a new one, there can be no question but that such evidence is incompetent as tending to prove negligence.   If an accident happened upon a railroad by reason of a broken rail, it would be quite competent to show that after the accident the broken rail was removed and replaced by a sound one as a mere matter of fact, but it would be incompetent to show that after the accident a different make and style of rail was used as tending to show negligence in using the style of rail upon which the accident took place."

5. It would have been proper for the court, by ruling or instruction, to have confined the evidence admitted to the purposes herein indicated, but the objection was general and no such limitation was requested.   Under such circumstances, defendant cannot now complain of its admission: *Woods* v. *Missouri, K. & T. R. Co.,* 51 Mo. App. 500.

6. It is objected that the allegations of fraud in the procurement of the release are not sufficient to justify the admission of plaintiff's testimony in regard to it. The allegations are somewhat general; but, no objection having been made by demurrer or by motion to make more definite, we think them sufficient after verdict,

especially since the attention of the court was not specifically called to the alleged defect during the trial.

7. The instruction given by the court in reference to the degree of care required of a master and servant correctly stated the law: *Doyle* v. *Missouri, K. & T. Trust Co.*, 140 Mo. 1 (41 S. W. 255); *Choctaw O. R. R. Co.* v. *McDade*, 191 U. S. 64 (24 Sup. Ct. Rep. 24, 48 L. Ed. 96). Standing alone, the instruction is not to be commended, but taken in connection with the whole charge, which was able, and fully and fairly stated the issues, the defendant has no reason to complain.

8. The requests of defendant for instructions were, we think, sufficiently covered by the general instructions of the court. The instruction given is as follows: "This paper, purporting to be a release, is regular upon its face, and the presumption of law to begin with is that it was executed in good faith. Fraud is never presumed but must be established under our laws by reasonably clear and satisfactory evidence. The burden of proof upon this question is upon the plaintiff to establish that this paper, purporting to be a release, was signed and executed through fraudulent misrepresentations upon the part of the defendant." The language of defendant's request was as follows: "I instruct you that it is a general rule that the plaintiff cannot be heard to say that he did not know the contents of the release or the paper signed by him when he had an opportunity to read it." It may be conceded that this request states a rule to a certain extent general, but the exceptions to it are so numerous that, stated baldly and without the qualifications which the law has attached to it, the probable result would be to mislead the jury, who would be likely to accept the statement that such was the "general rule" to mean that it was the universal rule.

9. The objection that the sealed verdict was received and opened after the jury had separated cannot avail

the defendant.   It appears from the direction of the court to the jury that it was agreed that they might disperse upon delivering to the bailiff their sealed verdict. No objection to this statement was made by counsel for defendant at the time; neither was any objection made at the time the bailiff delivered the verdict to the court, nor at any time, until a motion for a new trial was filed.   In the condition of the record, we must assume that consent was given by counsel to the separation of the jury and to the reception of the verdict in their absence.

The judgment is affirmed.                    AFFIRMED.

MR. JUSTICE BURNETT delivered the following dissenting opinion:

The plaintiff instituted this action to recover damages from the defendant for injuries suffered by him in its mill on account of the alleged negligence of the defendant in not providing for him a safe place in which to work.   Admitting that the plaintiff was injured, the defendant denied all liability therefor and affirmatively pleaded, with other defenses, that the plaintiff, in consideration of the payment to him of $200, released the defendant from all liability on account of the accident described in the complaint. The release was in writing, and the plaintiff admitted in his testimony that he executed the same, which is as follows:

"Portland, Oregon, November 19, 1910.

"In consideration of two hundred ($200.00) dollars, the receipt of which is hereby acknowledged, paid to me by the University Lumber & Shingle Company, I do hereby release the said University Lumber & Shingle Co. from and on account of all or any claim for damages that I may have against it for any reason whatsoever, and particularly on account of an accident which happened to me on the eleventh day of Novem-

ber, 1910, at the shingle mill of the said company near University Park, Portland, Oregon, at which time I lost all of the fingers and a portion of my thumb on my left hand, and in consideration of said sum I do hereby release said company from any claim for damages as is hereinabove set forth.

> "[Signed]   CHAS. L. FOSTER.   [Seal]
> "Witnesses:  [Signed]   IRENE CRARY.
>                          "C. E. MORTON."

Concerning this writing, the reply alleges as follows:

"The plaintiff, further replying to the said second and separate defense herein, alleges that on or about the 19th day of November, 1910, the employees in and about the mill of the said defendant, by and on account of the injury to the plaintiff, subscribed a sum of money for the plaintiff and placed the same in the hands of J. Kroenert, who is and was at said time the president and general manager of the defendant. That the said Kroenert promised and agreed that he would assist this plaintiff personally to the same extent as did the employees, and that while this plaintiff was suffering from the injuries to his left hand as set out in the complaint herein, and while he was suffering from the effects of the anesthetic administered to him at the time of the amputation of the fingers from his left hand, this plaintiff was ordered and directed to go to the said J. Kroenert to receive the money so subscribed. That plaintiff went to the office of said Kroenert. That thereupon the said Kroenert requested him to sign a paper, and falsely and fraudulently and unlawfully, and with intent to deceive and defraud this plaintiff, represented that the said paper was a receipt for the money so subscribed by the employees and by himself, and that the same was not intended and would not release the company from the damages sustained by this plaintiff, and that the defendant would continually employ the plaintiff in and about the mill and premises and pay to him the sum of seventy-five ($75) dollars each and every month as long as the mill continued to stand. That relying upon

the representation so made, and being sick and ill as aforesaid, this plaintiff signed the pretended release.''

In respect to this pleading, it will be noticed that, although the plaintiff claims that he was sick and suffering from the effect of the anesthetic nine days after the happening of the accident, he does not intimate that his mental faculties were in any way impaired or suspended. For aught that appears in the reply, the plaintiff had full control of his mind and memory, and, if he would defeat the release for want of understanding, he must plead either that he was *non compos mentis* or laboring under such mental distress at the time that he could not and did not comprehend the nature and consequences of the act he was performing in the execution of the release. *Brown* v. *Feldwert*, 46 Or. 363 (80 Pac. 414), was a case somewhat like this in that the writing sought to be impeached by the makers thereof was said to have been procured by fraud, and this court there held that: ''It is absolutely essential in pleading that a signer of a paper was fraudulently misled as to what was being signed, to show that the signer was free from negligence in the matter.'' No such allegation appears in the reply here. That pleading also does not state facts sufficient to constitute a rescission of the contract of release in that it is not averred that the plaintiff has restored to the defendant the money paid as a consideration for the release. In *Scott* v. *Walton,* 32 Or. 460, 464 (52 Pac. 180, 181), Mr. Justice Bean lays down the rule in this language:

''A party who has been induced to enter into a contract by fraud has upon its discovery an election of remedies. He may either affirm the contract and sue for damages or disaffirm it and be reinstated in the position in which he was before it was consummated. These remedies, however, are not concurrent but wholly inconsistent. The adoption of one is the exclusion of the other. If he desires to rescind, he must

act promptly and return, or offer to return, what he has received under the contract. He cannot retain the fruits of the contract awaiting future developments to determine whether it is more profitable for him to affirm or disaffirm it. Any delay on his part, and especially his remaining in possession of the property received by him under the contract and dealing with it as his own, will be evidence of his intention to abide by the contract.''

In our own state, authorities to the same effect are these: *Wells* v. *Neff*, 14 Or. 66 (12 Pac. 84, 88) ; *Crossen* v. *Murphy*, 31 Or. 114 (49 Pac. 859) ; *State* v. *Blize*, 37 Or. 404 (61 Pac. 735) ; *Dundee Mortgage Co.* v. *Goodman*, 36 Or. 453 (60 Pac. 3) ; *Van de Wiele* v. *Garbade Co.*, 60 Or. 585 (120 Pac. 752). The following authorities and many more which might be cited teach the same doctrine: *Rabitte* v. *Alabama Great S. Ry. Co.*, 158 Ala. 431 (47 South. 573) ; *Norwich Union F. Ins. Soc.* v. *Girton*, 124 Ind. 217 (24 N. E. 984) ; *Valley* v. *Boston R. Co.*, 103 Me. 106 (68 Atl. 635) ; *Drohan* v. *Lake Shore Ry.*, 162 Mass. 435 (38 N. E. 1116) ; *Pangborn* v. *Continental Ins. Co.*, 67 Mich. 683 (35 N. W. 814) ; *Crippen* v. *Hope*, 38 Mich. 344; *Morris* v. *Great Northern Ry. Co.*, 67 Minn. 74 (69 N. W. 628) ; *Lane* v. *Dayton Coal Co.*, 101 Tenn. 581 (48 S. W. 1094) ; *Brainard* v. *Van Dyke*, 71 Vt. 359 (45 Atl. 758) ; *Town's Admr.* v. *Waldo*, 62 Vt. 118 (20 Atl. 325) ; *Louisville etc. Ry.* v. *McElroy*, 100 Ky. 153 (37 S. W. 844) ; *East Tenn. Ry. Co.* v. *Hayes*, 83 Ga. 558 (10 S. E. 350) ; *Vandervelden* v. *Chicago Ry. Co.* (C. C.), 61 Fed. 54; *Barker* v. *Northern P. Ry. Co.* (C. C.), 65 Fed. 460.

An apparent exception to this rule requiring the return of what has been received of benefit from a contract before rescission is allowed is found in cases where the amount due on the contract to the person executing the release has been fixed and determined so that the sum paid is really a part of a greater indebted-

ness.  In such a case part payment of an acknowledged larger sum constitutes no consideration for a release of the entire indebtedness, and hence the plaintiff in such case is entitled to prosecute such an action, and that, too, without returning the amount paid, because that was rightfully his own in the first instance. It is analogous to bringing an action for a balance of account giving credit for a payment already made. Where, however, the amount is unliquidated, as in the case of a claim for damages, the rule is uniform that, before a release alleged to have been obtained by fraud can be disregarded or rescinded, the party alleging the fraud must return the amount paid for the release.

The case in hand is distinguishable in that respect from *Olston* v. *Oregon Water Power Co.*, 52 Or. 343 (96 Pac. 1095, 20 L. R. A. (N. S.) 915).  This was an action to recover damages for death of the plaintiff's intestate caused by the negligence of the defendant.  A release under seal was pleaded as a defense, but the plaintiff alleged not only false and fraudulent misrepresentations made by the defendant with intent to defraud and deceive the plaintiff, but also that he had returned all the money and other things received as a condition for the release, thus bringing himself within the doctrine of the precedents of this state already quoted.  Opposed to this rule requiring the return of the consideration in order to overturn the release of an unliquidated claim is the case of *Girard* v. *St. Louis Car Wheel Co.*, 46 Mo. App. 79.  That case, however, stands practically alone on the question directly involved, and it bases its reasoning on cases where the claim was fully liquidated and the amount actually determined before the release was signed.

Passing the insufficiency of the reply in the respects mentioned, it is proper to examine the testimony in connection with the fraud charged.  There are three elements of deception imputed to the president and

manager of the defendant, who induced the plaintiff to sign the release in question: (1) That he "represented that said paper was a receipt for the money so subscribed by the employees and himself." (2) "That the same was not intended to and would not release the company from the damages sustained by the plaintiff." (3) That the defendant would continually employ the plaintiff in and about the mill and premises and pay to him the sum of $75 each and every month as long as the mill continued to stand." The first two of these specifications are representations of the legal effect of the paper in question, and the third is a promise of what the defendant would do in the future. The plaintiff is the only witness who testified in his behalf respecting the execution of the contract of release. He narrates in his direct examination that he went to the office of the company for the purpose of getting a check for the amount subscribed for his benefit by his fellow employees. After some conversation with the manager as to how the accident occurred, the witness proceeds thus:

"And he asked me if I would stay there for two or three minutes until he went out. I says, 'Yes.' He went out and I did not have the time; I did not look at the time when he went out or when he came in, but it was not very long, and he came in with a tall dark-complexioned man I have never seen before, never seen since, and don't know who he was. And he sat down at this table. 'Now,' he says, 'look over that and sign it, and I will have Mrs. Somebody [I don't recollect her name] write you out a check for $200'; and he says, 'I will give you a job as long as that mill runs, and I will see that you and your family will never want for nothing; if you are ever in want, I want you to come and tell me.' So I looked at the paper; I did not read much of it; I started in; and I turned round to him and I says, 'Is that in the paper?' He says, 'No, but you can take it for granted from me that it

will be just as I am telling you that it will; you sign that and I will give you $200 more, and you will never want for nothing.' I signed the paper and he had that man sign it, and he had the woman sign it; the woman stenographer at his place sign it; and that was all and I took the money and left.''

On cross-examination he testified as follows:

''Q. And did not Mr. Kroenert hand you at this time this paper, which I now present to you, and which I will ask to have marked defendant's Exhibit C?'

''A. That is my signature.

''Q. And this defendant's Exhibit C is the paper, is it not, that you signed at that time?

''A. That is my signature on it.

''Q. Well, that is the paper you signed at that time?

''A. Must be.

''Q. Now, as a matter of fact, you took that and read it, did you not?

''A. I did not.

''Q. At that time?

''A. I took it, but I did not read it.

''Q. You say, then, you did not read it?

''A. No, sir; I tried to read it; I glanced it over; and he says, 'You go ahead and sign that, and I will have Mrs. Crary [or whatever her name is] make out a check for $200.'

''Q. You had it in your hands?

''A. I had it in my hands.

''Q. And glanced it over?

''A. I glanced at it; I am not much of a reader; and it would take me some time to read it; and I am suffering pain, I was sick at the time; I could not content myself to stay there so long.

''Q. You say you did not glance over it?

''A. I just glanced at it, yes, and I asked him if the job was on that; that he said that I and my family would never want for nothing; I asked him if that was on it, and he says, 'No, but I will guarantee it is all right; you go ahead and sign it.'

"Q. You say he told you the question of this job was not in the paper?

"A. Yes, he told me that was not in the paper. I asked him if it was in the paper, and he said, 'No.'

"Q. He told you it was not?

"A. Yes, I asked him, 'Is that down in the paper?' and he said, 'No.'

"Q. Did Mr. Kroenert read that release to you?

"A. No, sir; he did not.

"Q. Do you claim now that Mr. Kroenert misstated to you the contents of what that release was?

"A. He did not state what it was. He says, 'Sign this and I will have Mrs. Crary write you out a check for $200, and that will make you a nice little bunch of money.' That is what he said.

"Q. Then, as I understand, he did not tell you what was in that paper?

"A. No, sir; he did not; never mentioned what was in it whatever.

"Q. That was the only talk you had with him about the paper, which you signed, was whether or not the kind of job was in that and he told you it was not?

"A. That was the only question that came up.

"Q. So that, as a matter of fact, Mr. Kroenert did not deceive you when you signed that paper, did he?

"A. He did not.

"Q. He did not say anything to you what was in it, did he?

"A. He did not say what was in it, no.

"Q. So that, as I understand you to say, he did not represent to you what that paper was at all?

"A. He did not."

The plaintiff evidently understood that he was about to execute some obligatory writing; for when, as he says, the manager promised verbally to give him a job as long as the mill run, etc., he demanded to know if that was in the paper, but the manager says, "No, but you may take it for granted from me that it will be just

as I am telling you that it will." Out of his own mouth he says that he had the paper in his hand with the opportunity of reading it and was told by the manager to look it over and sign it. Although he had the opportunity to and was urged to read the paper, he repeatedly says the manager did not read it to him; that the latter did not state what it was; and that "he never mentioned what was in it whatever," etc. Instead of proving the allegation that the manager represented that the paper "was a receipt for the money subscribed, and that the same was not intended and would not release the company from the damages sustained by the plaintiff," the testimony of the plaintiff himself directly contradicts and disproves the allegations of his reply.

To make statements fraudulent, they must be representations of past or present material facts. Fraud cannot be predicated upon a statement or mere opinion or bare promises of something to be performed in the future. If the promise is a part of the contract, the person complaining must rest his action upon a breach of that promise. Moreover, neither the defendant nor its manager is being sued for a breach of a contract to furnish employment to the plaintiff for an indefinite period. Disproving as he does, by his own testimony, the allegations of fraud contained in the reply, the plaintiff presents a case where, having every opportunity to inform himself of the nature of the instrument he was signing, he acted upon his own judgment and signed the release. In the well-considered case of *Wimer* v. *Smith*, 22 Or. 469, 486 (30 Pac. 416, 421), Mr. Justice LORD lays down the rule thus:

"Even where misrepresentations are made, if a person relies upon his own judgment when he has full means of knowledge, he cannot complain of such misrepresentations. On a charge of fraud, the burden of proof is on the party alleging it. The defendants

must clearly and distinctly prove the fraud or false representations they allege. The law in no case presumes fraud. The presumption is always in favor of innocence and not guilt. Fraud must be proved, but it must be proved by circumstances from which no other inference but that of fraud can be drawn. The rule is that, when proven by circumstances, they must afford a strong presumption. Circumstances of mere suspicion will not warrant the conclusion of fraud. 'The evidence of it,' Chancellor Kent said, 'must be clear, strong, and satisfactory.' And so likewise said the learned and eminent Dillon. In no doubtful matter does the court lean to the conclusion of fraud; it is not to be assumed on doubtful evidence. If the fraud is not clearly and strictly proved as alleged, relief cannot be had, although the party against whom the relief is sought may not have been perfectly fair in his dealings. The facts constituting fraud must be clearly and conclusively established by the court in finding it; but it may be proved by a preponderance of the testimony."

Here is a skilled mechanic, able to read, with the opportunity of reading and the reading urged upon him, whose perfect command of the English language, as disclosed by the testimony, shows him to be a man of more than ordinary intelligence. Under such circumstances, the releasor, having the opportunity to read, is bound by the terms of the instrument if he does not read it: *Spitze* v. *B. & O. R. R. Co.*, 75 Md. 162 (23 Atl. 307, 32 Am. St. Rep. 378); *Hoeger* v. *Citizens' St. Ry. Co.*, 36 Ind. App. 662 (76 N. E. 328); *Atchison, T. & S. F.* v. *Vanordstrand*, 67 Kan. 386 (73 Pac. 113); *McNamara* v. *Boston Elev. Ry. Co.*, 197 Mass. 383 (83 N. E. 878); *Leddy* v. *Barney*, 139 Mass. 394 (2 N. E. 107); *Mateer* v. *Missouri Pac. Ry. Co.*, 105 Mo. 320; *Williams* v. *Wilson*, 18 Misc. Rep. 42 (40 N. Y. Supp. 1132); *Missouri, K. & T. Ry.* v. *Craig*, 44 Tex. Civ. App. 583 (98 S. W. 907); *Watson* v. *Planters' Bank,*

22 La. Ann. 14; *Eldridge* v. *Dexter R. Co.,* 88 Me. 191
(33 Atl. 974) ; *Leslie* v. *Merrick,* 99 Ind. 180; *Hawkins*
v. *Hawkins,* 50 Cal. 558; *Starr* v. *Bennett,* 5 Hill
(N. Y.), 303; *Gibson* v. *Brown* (Tex. Civ. App.), 24
S. W. 574; *Powers* v. *Powers,* 46 Or. 479 (80 Pac. 1058).

It would have been an act of benevolent paternalism
for the manager to have more thoroughly explained
the nature of the writing which he presented for the
plaintiff's signature, to have called in the plaintiff's
friends and held a prolonged discussion concerning the
advisability of making such a contract, but the defend-
ant was under no obligations to do any of those things.
The parties were adversary to each other. Having
every opportunity to consider the matter, plaintiff was
bound to take care of his own concerns and the man-
ager could not assume to act as his guardian. Here
was at least a debatable claim against the company in
respect to which the defendant had a right to buy its
peace. The law encourages settlement of disputes.
Controversies once adjusted ought not to be reopened,
except for very cogent reasons; and where, out of the
mouth of the plaintiff himself, the alleged fraud is com-
pletely disproven, the court ought not to overturn the
agreement which the parties themselves made. The
reply is defective in that it does not show that the
plaintiff was free from negligence in the execution of
the release within the meaning of *Brown* v. *Feldwert,*
*supra;* also in not alleging that he had returned the
money received as a consideration for executing the
contract of release. On the merits, the plaintiff should
fail as against the contract, because out of his own
mouth he shows that the allegations of his reply are
completely disproven. It is not a case of there being
some evidence to take the case to the jury. It is a total
failure of proof. The release may have been improvi-
dently made, if we consider only the misfortune of the
plaintiff's injury without reference to whether he him-

self might have avoided it; but courts cannot make contracts for parties and ought not to overturn their agreements, except upon proper pleadings and sufficient testimony. To allow the defeat of the release on the allegations of the reply and the evidence of the plaintiff in support thereof would destroy the value of written contracts and invite perjury in litigation to avoid them.

The judgment should be reversed and nonsuit directed.