Argued October 14; affirmed November 12, 1930.

# PELUCK *v.* PACIFIC MACHINE & BLACKSMITH CO.

(293 P. 417)

*Arthur I. Moulton* of Portland (Lord & Moulton of Portland on the brief) for respondent.

*G. C. Fulton* of Astoria (G. C. & A. C. Fulton of Astoria on the brief) for appellant.

BELT, J. This is an action under the Employers' Liability Act to recover damages for personal injuries alleged to have been sustained by plaintiff while employed by defendant in the installation of two new gear wheels in a forty-eight-inch lathe machine.

The large gear wheel, which was attached to the face plate, or disk, of the lathe, was thirty-five inches in diameter and the smaller gear or pinion wheel which meshed in the large wheel was six inches in diameter. After these new gear wheels had been installed and the power was applied, it developed that the teeth of the wheels did not properly mesh, thereby causing excessive vibration. Plaintiff asserts that he called the attention of defendant's foreman to the trouble and suggested that the wheels be removed and put on a shaper or gear cutting machine in order to eliminate the rough spots and uneven corners of the teeth so that they would properly mesh. Plaintiff alleges that the foreman rejected this plan as being impracticable and that he carelessly and negligently ordered him "to connect said machine with the power by which the same was driven, then to fill the said gears with heavy grease and then to take certain emery dust which defendant supplied, and throw the same by hand into said

meshing gears as the same were propelled by power.''
Plaintiff alleges that he conformed to the orders of
the foreman and that while thus throwing the emery
dust up and into the gears, his hand was drawn into
the same and that by reason thereof it was crushed
and mangled.

The other specification of negligence, namely that
the gears were unguarded or uncovered, was with-
drawn from the consideration of the jury and, there-
fore, need not be discussed.

Defendant in its answer denied the charge of neg-
ligence and alleged affirmatively that plaintiff's inju-
ries were due solely to his own negligence in that he
undertook to throw emery dust into the gears while
the machine was in operation and that he did not obey
the order of the foreman to apply, by means of a small
wooden paddle which it furnished, a mixture of grease
and emery dust to the gears while the machine was not
in operation. Defendant alleges that it further in-
structed plaintiff to operate the machine for a short
time after such mixture of grease and emery dust had
been applied, then remove the gears from the lathe and
dress down the high spots with a file, and to repeat
this process until the gears functioned smoothly.

As a further and separate answer defendant alleges
that plaintiff, for a good and valuable consideration,
executed a written release discharging the defendant
from all liability for personal injuries arising out of
the accident upon which the complaint is based. Plain-
tiff in his reply admits that he signed the written
instrument purporting to be a release, but charges
that he was induced to sign the same by reason of
certain fraudulent representations of the defendant
that the instrument was a merely formal document

required by law to be signed by plaintiff in order to secure compensation under the Workmen's Compensation Act of this state.

Verdict and judgment were had for plaintiff in the sum of $6,000. Defendant appeals.

█ Plaintiff, at time of injury, was engaged in a work involving a risk or danger, and, under the stringent provisions of the Employers' Liability Act (Or. L., §§ 6785-6790), it was the duty of the defendant to use "every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity of preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices." Under this act, the defendant could not avail itself of the defenses of assumption of risk, fellow servant, or contributory negligence, although the latter may be taken into consideration by the jury in fixing the amount of the damage. Christofferson, the foreman, was, by virtue of the act, the agent of the defendant, and plaintiff would not be precluded from recovery by conforming to any order of the foreman, even though such order were negligent. As stated in *Yovovich v. Falls City Lumber Co.*, 76 Or. 585 (149 P. 941):

"Under section 5 of the act, when the decedent conformed to the orders of his superior according to his duty, the resulting injury was not his fault."

█ Plaintiff's action is predicated upon the alleged negligence of the foreman in directing him to throw emery dust into gears while the machine was in operation. Defendant practically concedes that such an act would constitute negligence but denies that such order was given. An examination of the record discloses that

there is evidence tending to establish the theories of both parties. It was, therefore, plainly a question of fact for the jury to decide. If plaintiff performed this work, as he claims, in obedience to the foreman's directions, the jury would be warranted in finding that he was unnecessarily exposed to danger and risk and that his employer did not exercise care and precaution for his safety. The argument of counsel for defendant that no experienced foreman would have ordered the throwing of emery dust into moving gears is convincing to the writer, but, alas, it was apparently not so to the jury.

Defendant's appeal is based principally upon the legal effect of the written release, its contention being that the plaintiff knew or ought to have known what he was signing; that no fraud or deception was practiced upon him to secure his assent to the settlement agreement, and that he is, therefore, bound by its terms. Plaintiff, who was about 60 years of age, was born in Germany and came to America in 1903. He has worked as a machinist since a boy 14 years of age and his education has, indeed, been very limited. He attended night school for a period of two weeks. He admits that he did not read the instrument before he signed it, nor the letter of explanation from the attorneys for the insurance company, which accompanied it, but states that had he done so, he would not have been able to understand their meaning. The instrument was executed while plaintiff was in the hospital, although not confined to his bed. His signature to the release was obtained about twelve days after the accident occurred. In speaking of his condition at the hospital, plaintiff testified:

"I can not roll one way or another way. I can't sleep. I can't sleep over there a week. After a while

I get little bit better I can get little sleep but I get all time nervous, and I get headache and every five or six minutes there comes some pain in my hand and chokes me and I get sick all over.

"Q. Couldn't you think clearly?

"A. No. It was all the time pain and I start crying. My mind never was clear when I come from hospital for a month.

"Q. How long was it before you could think clearly?

"A. It is not entirely clear now. I am not clear yet. I still kind of cry.

"Q. Were you nervous up to the time Harry Olson came to see you about this contract—this paper?

"A. Yes. Always nervous. I just sit in rocking chair when Harry Olson came in.

"Q. Could you think good then?

"A. No. I never think. I think ever—I never think ever at that time."

Harry Olson, who brought the release to the hospital, together with the letter of explanation, was secretary-treasurer of the defendant company. He also took an active part in the work at the machine shop. For many years he had been friendly with the plaintiff and it is fair to assume that the latter placed implicit confidence in him. In response to the question "What did Harry Olson say to you about this paper?" plaintiff testified:

"He had bring some paper to sign up and I asked him what kind of paper and he said it was some papers by the law—by the State of Oregon. This is your last month's check he says up to 14 days $2.11 per day and you will receive he says twenty-nine dollars, I believe fifty-four cents. I don't remember right. He said I don't know, he said, they promise to pay but you better stay in the hospital. By the law of the state of Oregon you should receive every money. You should receive every month that amount. He said you sign here and we go to bank and get money. Now you need the money."

The following portion of the record is also worthy of consideration:

"Q. Did he say to you what this paper was or explain what it was for?

"A. No. He never made me explain. He said it was 14 days for last month.

&ast; &ast; &ast; &ast; &ast;

"Q. Did he say anything about an insurance company that was to pay you?

"A. No. He don't explain me. He said I got to sign by law and I think it was state compensation. Before I was hurt and it was state compensation and there was another man before who says he was a judge, and another man came to see me."

Referring to the letter which attorneys for the insurance company wrote concerning the nature of the settlement, plaintiff said that Olson never read it to him nor explained its contents, and, in response to the question, "Why didn't you read it?" said, "Because I can't read it. I want read that and I don't know what say and know nothing about reading." At this juncture it is well to observe that, prior to the accident in question, plaintiff had sustained an injury for which he received compensation from the State Industrial Accident Commission and that he had executed some "formal papers" in connection therewith. He says that, when this release was presented to him, he did not know that the defendant company had rejected the Workmen's Compensation Act and thought his signature was necessary to secure compensation from the state. Plaintiff said that Olson was in his room at the hospital for about four or five minutes prior to the time of signing the paper. In further explanation of his failure to read the instrument before signing it, he testified that Olson said to him, "You will have lots of time to read that letter." In response to the

question, "Did he say to read it right then?" plaintiff answered, "No. He said, 'I have not time. We go bank when you sign.'" This is, perhaps a recital of the evidence most favorable to the contention of the plaintiff that he was induced to sign the release by reason of fraud or deception by the defendant. Much evidence was introduced to show that plaintiff understood what he was signing and that no unfair advantage was taken of him, but a review of the same is not necessary to determine the question whether defendant was entitled to a directed verdict.

 Ordinarily, courts look with favor upon settlement of controversies which may lead to litigation, but a release executed under the circumstances as disclosed by the record in this case should be subjected to close scrutiny. The parties were not dealing at arm's length. Plaintiff did not have the benefit of independent advice and he was not in a physical or mental condition to determine matters vitally affecting his welfare. A hospital is a poor place to transact business. There was no need of haste. It is doubtful if plaintiff knew what it was all about. Accepting his testimony as true, there was no explanation given to him of the writing which he signed, and even had he read the same he was not capable of understanding it. In the light of this evidence, this court cannot say, as a matter of law, that plaintiff knowingly gave his assent to release the defendant from all liability for the injuries sustained. It is argued that plaintiff could not have been injured if the insurance company agreed to pay him the same amount he would have received under the State Compensation Act. We cannot agree. Plaintiff was entitled to know with whom he was contracting. In all probability he would have felt more secure in the matter

of compensation if the extent of his injuries were to be determined by the State Industrial Accident Commission and not by an insurance company. There was evidence to go to the jury on the question of fraud. The mere failure of plaintiff to read the contract does not, of itself, preclude recovery. There is no need of restating the law. It is declared in the following analogous cases: *Wood v. Young,* 127 Or. 235 (271 P. 734); *Nielsen v. Portland Gas & Coke Co.,* 76 Or. 505 (147 P. 554); *Woods v. Wikstrom,* 67 Or. 581 (135 P. 192); *Foster v. University Lumber Co.,* 65 Or. 46 (131 P. 736); *Olston v. Oregon W. P. & Ry. Co.,* 52 Or. 343 (96 P. 1095, 97 P. 538, 20 L. R. A. (N. S.) 915). Also see the well-considered case of *Bliss v. New York, etc., R. R. Co.,* 160 Mass. 447 (36 N. E. 65, 39 Am. St. Rep. 504).

Several assignments of error have been made in reference to the instructions of the court, but it is not deemed necessary further to consider them, as appellant's exceptions thereto are based upon the proposition that there is no evidence of fraud in the case. While some of the instructions are subject to technical objections, it is believed, after careful study, that the issues were fairly submitted to the jury and that no error was committed which warrants a reversal.

It follows that the judgment of the lower court is affirmed.

Coshow, C. J., and Bean and Brown, JJ., concur.