Argued May 2; affirmed June 26, 1934

## HIBERNIA BANK *v.* McELLIGOTT

(34 P. (2d) 652)

*G. G. Smith,* of Portland (W. L. McFarling, of Portland, on the brief), for appellant.

*A. L. Veazie,* of Portland (Veazie & Veazie, of Portland, on the brief), for respondent.

ROSSMAN, J. Since the first assignment of error is based upon the contention that the trial judge erred when he construed the portion of the answer which we shall shortly review as a cross bill, we shall now set forth a brief review of those portions of the pleadings necessary to a disposition of this contention. The only portion of the complaint of which we need take notice avers that on November 25, 1930, "the said decedent, Richard McElligott, for value received, made and delivered to said Pacific Coast Linen Mills a certain promissory note" in the sum of $5,000, payable in six months; that McElligott died December 10, 1931; that this defendant is administratrix of his estate; that October 5, 1931, the payee assigned it to the Hibernia Commercial & Savings Bank as security for existing and future debts, and that still later this plaintiff, as a successor of the bank, acquired the note. The answer admits the allegation above quoted, McElligott's death December 10, 1931, and the appointment of the defendant as administratrix of his estate. All of the rest of the averments are denied. Following the aforementioned admissions and denials, we find in the answer the following: "The defendant, as administratrix of the estate of Richard McElligott, deceased, for a further separate answer and defense, and by way

of cross-complaint, alleges * * *.'' Then follows a series of allegations wherein the defendant avers that on or about November 25, 1930, the Pacific Coast Linen Mills, for the purpose of inducing McElligott to purchase some of the capital stock of that corporation, represented to him (1) that the corporation had a capital stock of 6,000 shares of no par value and 4,000 shares of preferred stock of the par value of $100 per share; (2) that ever since its organization the corporation ''had been doing a large volume of business and at said time had large orders for linen products''; (3) that the corporation ''ever since its organization had made large profits''; (4) that the corporation ''was well financed and had no unpaid obligations''; (5) that owing to its large volume of business the corporation needed additional working capital and desired to sell 500 shares of its preferred stock; (6) that these 500 shares were ''a first lien against all of the real and personal property'' of the corporation; (7) that the preferred stock ''was an unusually good and safe investment''; (8) that the corporation would pay annually to the holders of its preferred stock a dividend of 8 per cent; (9) that after a thorough and painstaking investigation the five individuals named in this portion of the answer had purchased preferred stock; and (10) that the corporation needed men of McElligott's ''caliber and mature wisdom to assist in the management and direction of the affairs'' of the corporation, and that if he would make a purchase he would be elected as one of the trustees of the corporation. Continuing, this portion of the answer alleges that McElligott was 77 years of age and ''was a retired farmer with no business experience except that connected with farming'' and that, believing these representations, he purchased 100 shares of the preferred and 100

shares of the common stock of the corporation at the price of $10,000, paying $5,000 cash and delivering to the corporation the promissory note mentioned in the complaint as the balance of the purchase price. This portion of the answer alleges that shortly after the purchase McElligott was elected a trustee of the corporation, that in the month of May, 1931, he made an investigation of its affairs, discovering a series of facts recited in the answer which indicated that the aforementioned representations were untrue. We shall not review the circumstances which the answer alleges McElligott discovered except the following: ''At said time, to wit, November 25, 1930, the liabilities of the Pacific Coast Linen Mills were in excess of its assets; that the 100 shares of stock which the said Richard McElligott received were worthless.'' Upon the alleged discovery of the truth, the answer avers that McElligott tendered to the corporation the return of this stock and demanded that it return to him his aforementioned promissory note but that his demands were ignored. Next, the answer avers ''that by reason of the wrongful, unlawful and fraudulent representations, statements and allegations made by the Pacific Coast Linen Mills, its officers and agents, as aforesaid, the signature of the said Richard McElligott to said promissory note was secured through fraud and misrepresentations and therefore said promissory note is without consideration and is null and void''. The prayer of the answer prays ''that the plaintiff recover nothing of and from the defendant and that a judgment be entered in favor of the defendant declaring said promissory note null and void and that the same be cancelled and that the defendant have judgment against the plaintiff for all costs and disbursements''. The reply denied all averments alleging fraud.

The trial judge construed the affirmative allegations of the answer together with its prayer as a cross-complaint seeking equitable relief, and, since the defendant had requested a trial of the cause by a jury, impaneled an advisory one to try the issues presented by the affirmative allegations of the answer and the reply. We add that still later he directed a verdict for the plaintiff, announcing that the evidence failed to substantiate the charge of deceit. After the affirmative allegations had been construed in the aforementioned manner, the defendant, according to the record, "demanded and was granted the right as moving party in said proceedings to open and close". During the presentation of the evidence she availed herself of the privilege incidental to the trial of a suit in chancery of having evidence to which objections had been sustained taken nevertheless and included in the record as excluded evidence. Upon appeal to this court she has presented no bill of exceptions, apparently deeming that the cause is here for trial de novo. After the circuit court had placed upon the defendant's pleadings the above interpretation the defendant did not amend her pleadings in any manner and they remain now in precisely the same form as when the cause came on for trial in the circuit court. The ruling made by the trial judge which interpreted the affirmative allegations of the answer as a cross-complaint is the subject matter of the first assignment of error.

■■■ Considering this assignment of error, it will be observed from the above review that the defendant denominated the portion of the answer with which we are concerned as a cross-complaint and concluded it with a prayer for the cancellation of the note described in the complaint. The note was overdue and hence

could no longer pass into the possession of a holder in due course, but, since it had been pledged to the bank as security for a comparatively small sum of money, the pledgee, when confronted with the charges averred in the answer, could have chosen, in the absence of a cross bill seeking affirmative relief, to dismiss its action and return the note to the payee. Possibly fear that such a development would occur thereby subjecting the defendant to expense and delay in the settlement of the estate may have prompted her to seek cancellation of the note, thereby endeavoring to terminate forever contentions arising out of the execution of the note. In *Northwestern & Pacific Hypotheek Bank v. Ridpath,* 29 Wash. 687 (70 P. 143), a cross-complaint is defined thus:

"A cross-complaint is in the nature of an original action. Powell v. Nolen, 27 Wash. 318, 67 P. 712. When the defendant files a cross-complaint and seeks affirmative relief he becomes the plaintiff and the plaintiff in the original action becomes the defendant in the cross-complaint."

While it is true (as is indicated in the following cases cited in the defendant's brief: *Peluck v. Pacific Machine & Blacksmith Co.,* 134 Or. 171 (293 P. 417); *Wood v. Young,* 127 Or. 235 (271 P. 734); *Sanford v. Hanan,* 80 Or. 266 (156 P. 1040); and *Olston v. Oregon Water Power & Ry. Co.,* 52 Or. 343 (96 P. 1095, 97 P. 538, 20 L. R. A. (N. S.) 915)) that the averments of the answer constituted a complete defense to the action upon the note, nevertheless, one who has a complete defense may also have awarded to him an equitable remedy if the circumstances of which he is possessed are such that they confer jurisdiction upon a court of equity. Cancellation is exclusively an equitable remedy.

We quote from Pomeroy's Equity Jurisprudence (4th Ed.), section 221, wherein the author is referring to the equitable power to cancel instruments:

"Such remedy is entirely equitable; but when the injured party has a legal estate in the subject-matter or a legal primary right, he may set up the actual fraud as a defense in an action at law, if his legal title is thereby attacked, or a recovery is thereby sought against him on the instrument. Whether, under these circumstances, and at the suit of a party holding a legal interest or a legal primary right, the exclusive jurisdiction will be exercised for the purpose of protecting his estate or maintaining his right, by decreeing a cancellation or a surrender of the instrument thus affected by fraud, depends upon the question whether the legal remedies, either affirmative or defensive, open to the party, are inadequate to promote the ends of justice, and to affirm him complete relief. In the same manner, where a bill of exchange, promissory note, or other negotiable security, has been obtained by fraud, conversion, or other like manner which would create a valid defense at law as between the original parties, the acceptor, maker or other party apparently liable on the instrument may invoke this jurisdiction of equity, before the maturity of the paper, against the holder, and procure an injunction restraining him from making any transfer to a bona fide purchaser, and even the final relief of a cancellation or surrender; because in such a case, if the present unlawful holder, although the legal defense to an action by him would be perfect, should transfer the security to a bona fide purchaser, such legal defense would be cut off, and the injured party would be without adequate and complete remedy in a court of law."

See also 9 C. J., Cancellation of Instruments, page 1160, section 6; and 4 R. C. L., Cancellation of Instruments, page 494, section 8.

■ It will be observed that ordinarily a court of equity does not assume jurisdiction for the purpose of

cancelling a note unless an opportunity remains for the instrument to find its way into the hands of a holder in due course. We have found no instance in which a court of equity has assumed jurisdiction under circumstances similar to those now before us. Nevertheless, in the present cause the answer and not the complaint sought equitable relief. There exists the well-known distinction between jurisdiction (jurisdiction over a class of cases to which the particular case belongs) and power (the right of the judicial officer whose court has jurisdiction to make a ruling). It is obvious that the answer sought to confer upon a court of equity jurisdiction over this cause by pleading fraud and seeking the equitable remedy of cancellation. We again quote from Pomeroy's Equity Jurisprudence (4th Ed.), section 130:

"On the contrary, as will be more fully stated hereafter, the objection that the case does not come within this so-called equity jurisdiction must ordinarily be definitely raised by the defendant at the commencement of the proceedings, or else it will be regarded as waived, and the judgment will not even be erroneous."

The rule stated by Pomeroy in the language just quoted has been applied by this court many times. From *Nicholas v. Title & Trust Company,* 79 Or. 226 (154 P. 391, Ann. Cas. 1917A, 1149), which collects many of our earlier holdings, we quote:

"A court of equity thus having general jurisdiction to protect an easement at the suit of an owner, any defect in a complaint, interposed for that purpose in such forum, is waived when the defendant fails to demur for lack of jurisdiction of the subject-matter and also joins in an application for equitable relief: [cites authorities]. The defendant by failing to demur to the complaint, and by praying for affirmative relief in its answer, thereby waived all questions of jurisdic-

tion, since a court of equity has the right to hear and determine suits involving easements.''

In *Municipal Security Company v. Baker County,* 33 Or. 338 (54 P. 174), the plaintiff instituted a suit to have warrants owned by it declared valid obligations of the defendant. The latter, after pleading fraud and praying for cancellation of the warrants, challenged the jurisdiction of equity to entertain the cause. We quote from the decision:

''A question was made at the argument, and is somewhat insisted upon in the brief, that a court of equity is without jurisdiction to entertain the cause of suit set forth by the complaint, because plaintiff has an adequate remedy at law; but the defendants have themselves, by their answer, sought and demanded equitable relief which precludes them from raising the question.''

We believe that the principle above stated by Pomeroy and employed in the above decisions is decisive of the present controversy. The averments of the answer and the prayer for cancellation brought the cause within the general scope of equitable jurisdiction and if the court's ruling, whereby it assumed jurisdiction, is erroneous the defendant is not in a position to complain.

■ There remains for consideration only the contention that the defendant's charges of fraud are supported by the cogent character of proof required in causes of this kind. The defendant relies almost entirely upon the testimony of one Fred H. Kelley and upon various documents showing the financial condition of the corporation. Kelley testified that in April or May, 1931, he had accompanied McElligott to the office of Fletcher Linn, an official of the Pacific Coast Linen Mills, who, on its behalf, had sold the stock to

McElligott, when, according to Kelley, McElligott accused Linn of having made several fraudulent representations to induce the purchase. These purported representations are similar to some of the averments of the complaint, the balance of the allegations of the complaint being entirely unsupported by proof. The defendant contends that Kelley's testimony indicates that Linn acquiesced in McElligott's accusations by remaining silent when some of the charges were made, and explaining as to others that not he but one of his salesmen made the representations. The defendant contends that Linn at that time admitted he overheard his salesman's untruthful words. She also contends that the evidence shows the aforementioned financial statements to be false. She claims that they fail to show as liabilities of the corporation unpaid taxes and unpaid interest upon the corporation's bond issue. She also claims that the financial statement given to McElligott as a prospective purchaser of common stock should have contained an indication that the corporation had failed to pay dividends upon its cumulative preferred stock, and that the expenses of conducting the corporate affairs until manufacturing was commenced should not have been entered in the machinery and building accounts but as a deficit in the profit and loss account.

■ The transcript of evidence covers 362 pages and is accompanied by numerous lengthy exhibits. Due to the volume of the evidence it is impracticable to set forth herein a review of it. We have, however, read all of it with care. Kelley's testimony was contradicted by Linn whom the defendant also called as her witness and for whose credibility she, therefore, vouched. It is also discredited by the testimony of one Leon C. Wilson to whom McElligott had spoken when he first

became interested in the purchase of this stock. If McElligott made the accusations of deceit against Linn in the manner described by Kelley it would seem reasonable to believe that a feeling of hostility would have arisen between the two men. To the contrary, it appears that McElligott, a few days after this alleged unfriendly interview, rode with Linn to Vancouver, Washington, where the two men attended a meeting of the board of trustees of the corporation, both of them being members of that body, and that shortly thereafter McElligott, as Linn's guest, rode with him upon a long trip to the flax fields. Further indicating that Kelley's testimony should not be accepted as truthful is the circumstance that the corporate records indicate that on June 30, 1931, McElligott attended the annual meeting of the stockholders where he was reelected a trustee, after which, on July 24, 1931, at the annual meeting of the trustees, he renominated Linn for the office of vice president of the corporation. Upon the same day he subscribed to his oath of office as trustee. Still later with two of his co-trustees he called at the bedside of Linn when the latter was confined by illness. From the time that McElligott was first elected a trustee on December 12, 1930, to the time of his death December 10, 1931, he continued to discharge the duties of his office, attending virtually every meeting of the trustees, they sometimes occurring more frequently than once a month. At those meetings, according to the undisputed testimony, he never made any claim that he had been deceived into the purchase of his stock. Upon the other hand, on April 4, 1931, after he had served for four months on the board of trustees where he had repeatedly heard the financial condition of the corporation discussed, he purchased without solicitation $5,000

worth of additional stock, paying on account $1,000 cash. The testimony indicates that the unpaid taxes were entered upon the corporation books. The owners of the preferred stock had waived in the corporate minutes their rights to past unpaid dividends, and, therefore, according to the uncontradicted testimony, there was no occasion to note these unpaid dividends in the corporation's financial statements. Linn testified that he and two others owned virtually all of the bonds issued by the corporation and that the three had agreed to forego their rights until the manufacturing operations of the corporation had gained headway. Nothing to the contrary appears, and, since the evidence fully warrants a belief that Linn is a man of integrity, having himself invested large sums of money in the corporation, we accept his statement as revealing truthfully the attitude of the bondholders. The evidence indicates that almost all of the expenditures entered in the machinery and buildings accounts were sums paid to mechanics engaged in setting up the intricate machinery and in erecting the buildings. Testimony indicates that under such circumstances those expenditures were properly entered in the building and machinery accounts. The sole exception is $40,000 organization expenses, but since the uncontradicted evidence shows that the machinery and building accounts list the buildings at less than their actual value, these entries are not, in fact, untruthful. The evidence indicates that McElligott was a shrewd man whose ability had enabled him to accumulate a large estate. His advanced years had not dimmed his intellect. Before he purchased his stock he was given a statement showing the financial condition of the corporation, and before buying he spent a reasonable amount of time at the plant of the corporation making

an inspection of its equipment. The financial statement truthfully showed the amount of outstanding stock and bonds. His visit to the plant showed him that manufacturing operations had not yet begun and would have to be deferred until the machinery was installed. Immediately after McElligott's purchase he became a trustee, attending numerous meetings where the affairs of the corporation, especially its finances, were discussed. As we have seen, after he had these opportunities to fully acquaint himself with the affairs of the corporation, upon his own initiative he made an additional purchase of stock. The evidence indicates that the men who undertook to start this new industry were men of high standing in the Northwest and were in no sense prompted by a purpose to profit from the sale of the stock. To the contrary, as we have seen, Linn made a substantial investment in the stock and bonds of the corporation. He also loaned to it several thousand dollars upon its promissory note. The evidence indicates that before undertaking this new enterprise he had established in Oregon several successful industries of large magnitude. Without setting forth further our analysis of the evidence, we state our conclusion that it does not warrant a belief that any deceit was practiced upon McElligott, and it therefore follows that the cross-complaint is unsupported by the character of proof required in suits of this character.

Having disposed of all of the contentions advanced by the defendant, it follows that the judgment of the circuit court must be affirmed.

RAND, C. J., and BELT, J., concur.

CAMPBELL, J., concurs in the result.