Argued December 3, 1936; reversed March 30; rehearing denied
April 27, 1937

## BROAD *v.* KELLY'S OLYMPIAN CO.

(66 P. (2d) 485)

*Louis A. Recken*, of Portland (Senn & Recken, of Portland, on the brief), for appellant.

*Harry G. Hoy*, of Portland (Hoy & Doxey, Wm. P. Lord, T. Walter Gillard, and Arthur E. Prag, all of Portland, on the brief), for respondent.

ROSSMAN, J. The appeal presents two assignments of error which are based upon the following contentions: (a) The record contains no evidence that plaintiff's signature to the release, which he admitted signing, was obtained through fraud; and (b) the record indicates that the plaintiff assumed the risk of the condition which resulted in his alleged injury. We shall now consider the first contention.

The defendant operates an establishment in Portland where the plaintiff, a former boxer, 62 years of age, who referred to himself as "Kid Broad", was employed as night janitor. May 23, 1933, while he was discharging his duties he mounted a 10-foot ladder, and when it gave way he fell to the floor. The nature and extent of his injury was the subject of dispute at the trial. He stressed especially an injury to his right arm; apparently his other injuries were minor.

The complaint describes the injuries thus: "Severe injuries to his spine, sacrum, right hand and right wrist, right leg near the ankle, and the right foot and heel, and plaintiff was severely bruised and contused about various parts of his body and head, and suffered severe

nervous shock, and plaintiff was thereby caused to suffer severe pain and suffering." As a witness, the plaintiff swore that after the accident, "my hand seemed to be hanging down and I couldn't move it, I couldn't do nothing with it. * * * I was in pretty bad shape * * * and my arm was hanging down." While he was thus testifying his counsel stated, "The evidence will show that he has had both bones of the arm near the wrist broken * * *." The trial judge then inquired, "In this injury?" and received the reply, "I don't know, but that is a question for the jury." He then asked, "Doesn't he know whether it happened in this accident?" and plaintiff's counsel replied, "No, he knows this, Your Honor, and I wanted to say I was going to show by this witness that he never before had had an injury to his arm, to his knowledge, there above the wrist, and that he never had his arm in a cast or in a sling before this time * * * I think the jury will have a right from that evidence to infer that his break near the wrist occurred at that accident * * *." At this point the plaintiff called as a witness Dr. Alan Welch Smith who first saw the plaintiff two days before the trial, which was almost three years after the accident. As a result of his examination by X-ray he found that the plaintiff "had an old fracture, an old, probably unreduced fracture of his radius and ulna." He swore that any discomfort or disability that the plaintiff was experiencing in his right arm and hand was "brought about, in my opinion, by this old fracture." The witness swore, "That is an old break" but declined to estimate how long ago it had occurred until he was shown an X-ray photograph of the plaintiff's arm, taken 13 days after the accident, and was asked, "Isn't it a fact that break occurred more than a year before the picture was taken?" He replied, "Yes. It

would have to be sufficiently long to have that bony tissue become solid." To the inquiry, "Would you say that it would be at least a year before that was taken?" he replied, "Yes." After Dr. Smith had left the witness stand the plaintiff was recalled and the following occurred:

"Q. Now, Mr. Broad, at any time prior to the time you had this fall on the 23rd day of May, 1933, did you ever have an injury to your right forearm near the wrist? A. No.

"Q. Was your arm ever bandaged there before? A. No.

\* \* \*

"Q. You want this jury to understand that prior to this time you had never had your arm broken? A. I am saying yes, that I never had it broken.

"Q. Never had it in a cast before? A. No, sir, never had a cast on me body at no time.

"Q. Never had a doctor for this right arm before? A. No, the only cast I ever had on me body was me nose."

He claimed that he was still experiencing a disability in his right arm and attributed it to the fall in defendant's establishment. He swore that Dr. Carl J. Hollingsworth, his physician, "told me the hand was broken" in the fall, and stated positively that Dr. Hollingsworth did not tell him that the X-ray plates showed an old break.

The plaintiff swore that in September, 1933, he suffered what he termed "a relapse" which caused him to be confined for nine weeks in Good Samaritan hospital, Portland, and, finally, to resort to the use of crutches. He testified that Dr. W. E. Gregson attended him upon that occasion, and described the treatment which was then given him thus: "They put both my legs and both my arms in a cast and they gave me dope and I blew up like a balloon."

Sometime after the plaintiff's fall from the ladder he decided to see whether he could obtain compensation for his injury, and called upon Alfred P. Kelley, a capable member of the Oregon bar, for the purpose of securing Kelley's professional skill in pressing his claim. After a conference the two called upon one J. F. Gill, adjuster for the insurance company which had written a policy of casualty insurance in defendant's favor. They asked for $300 as satisfaction of the claim, which Gill refused to pay. Later the plaintiff returned to Kelley's office. Kelley then told him that his only alternative was litigation, but when the plaintiff replied that he was unable to advance the costs, Kelley suggested, according to the latter's uncontradicted testimony, "I don't know, but under all the circumstances here it seems to me as though perhaps you could work out a settlement with those people just as well by yourself as you could be represented by counsel, and my suggestion to you is that if you wish to go ahead and work out a settlement with them, don't feel obligated to me. I am perfectly willing to release you without any charge for the services I have performed, and, not having to pay me for any services, you perhaps can work out a more moderate settlement with them and not have to give any of that money to me, and in the long run you will be better off." That ended the relation between the two men. Later the plaintiff returned "three or four times," according to his estimate, to Gill's office and, finally, on July 20, 1933, signed a document entitled "Release." At the time he signed this paper he was given a check for $99.84 which he cashed. Gill stated that this sum represented eight weeks' compensation, computed upon the tables of the State Industrial Accident Commission. The uncontradicted testimony of Gill indicates that his insurance company also paid the

plaintiff's medical bills amounting to $40.50, as it had agreed to do when the release was signed. The latter, which is upon a single sheet of letter-size paper, is type-written and states: "I, Eugene Broad, for the sole consideration of $ One hundred Forty and 34/100 to me in hand paid by Kelly's Olympian and/or The Metropolitan Casualty Insurance Co., the receipt whereof is hereby acknowledged, have released and discharged * * * said Kelly's Olympian" by reason of the injury of May 23, 1933.

The plaintiff now claims that the release was fraudulently obtained. His pleading avers that he and Gill had agreed at the time the release was signed that 10 weeks' compensation was then due to the plaintiff and "that further compensation checks would be issued to this plaintiff as time went on and during his disability." The pleading avers that the plaintiff was unable to read the document because he had no spectacles, and that Gill described it to him as "simply a formality required by the headquarters 'in Frisco' and a receipt for compensation for a certain time (eight weeks to plaintiff's present belief and recollection) which was all that he was at that time able to obtain from his company" for the plaintiff. The pleading avers that the plaintiff signed the document believing that it was merely a receipt for eight weeks' compensation and that he also believed that payment of compensation would continue until his complete recovery.

The plaintiff did not call Dr. Hollingsworth as a witness. He claimed that the latter was in the employ of "the insurance company." As a witness for the defendant, Dr. Hollingsworth swore: "I am the doctor for the cooks' local here in Portland, the cooks' and helpers' local, and whenever any of their members are

ill or injured I am called upon to see them, and in that capacity I was called to see Mr. Broad the day following his injury." He denied that he had ever been employed by the defendant or the Metropolitan Casualty Insurance Company. After the injury Dr. Hollingsworth took the plaintiff to the Good Samaritan hospital for the purpose of having X-ray pictures taken of his right arm. Dr. Hollingsworth swore that after the photograph had been taken, "My diagnosis was that the man had sustained numerous bruises and a laceration on the right shin, but that there were no broken bones." He declared that the picture showed a fracture of the bones of the right arm which must have occurred at least "several months" before the photograph was taken. Dr. Wallace Haworth, X-ray technician of Good Samaritan hospital, who took the picture, testified that it indicated "an old fracture. * * * The evidence of the fracture is almost entirely obliterated. There is a little thickening of the shell portion of the cortex of the bone on both of the bones and a little excess callous on some of the margins right at the point of the break." When he was asked to estimate how long ago the fracture had occurred, he swore, "Well, it takes, as a rule, years in order to entirely obliterate a fracture line. I think it would be fair to say that this took place any time from two or three years to twenty years prior to the injury." Dr. Frank E. Butler, who has specialized in X-ray work for thirteen years, testified that he took an X-ray photograph of plaintiff's right arm June 5, 1933, and swore that the fracture shown in it must have occurred prior to the plaintiff's injury, "several months or a year or maybe two years. It is very hard to say exactly, but it would take months for all these things to happen". He was referring to the healing process and the disappearance of callous. Dr. Harry C. Blair,

who stated that he specialized in "orthopedic surgery; diseases of bones and joints," testified that he examined the plaintiff on May 28, 1933, and that in the course of the examination he took an X-ray photograph of the right arm. He swore that the fracture was "at least six months old" when the picture was taken. He was further asked and answered as follows:

"Q. And how much older than that could it be? A. It might be any number of years.

"Q. Twenty or thirty years? A. Yes, that is possible."

Dr. Blair swore that the plaintiff told him "that he had broken his wrist forty years ago". Mr. Kelley also testified that the plainttiff told him that "he had had an injury to his hand at some time prior to this particular injury".

After all of this testimony had been taken and the defendant had rested, the plaintiff, in the course of his rebuttal testimony, admitted "I might have told him (Dr. Blair) that it was broken some years ago." He declared, "I don't remember" what treatment was employed at that time; and when asked whether his arm was put in a cast, he replied, "I don't think so." He added, "I broke it fighting." After a recess, the plaintiff testified: "I didn't say I broke it; I sprained it or duked it. That means that it cracks." But after he was plied with several additional questions, he said, "Well, I broke it, I suppose. It can't be anything else." He stated that it was his hand and not his arm that was fractured upon the previous occasion. To the further inquiry whether his arm had ever been broken, he replied, "I don't think I ever broke my arm that I know of; I don't know anything about it."

It will be recalled that the plaintiff claimed that he suffered a relapse in September, 1933, during which he was attended by Dr. Gregson. He swore that the latter refused to inform him of the nature of his disability, declaring, "I couldn't get anything out of it." He wholly failed to connect this "relapse" with the accident of May 23, 1933, unless the following testimony given by him constitutes the connection:

"Q. Did you have any recurrence of this injury that caused you to go upon crutches, that is to say, afterwards did you have to resort to the use of crutches in going about? A. Yes.

\* \* \*

"Q. Now you say that in September of 1934 you were on crutches? A. Yes, sir.

"Q. And you went to the hospital at that time? A. Yes, sir.

"Q. Well, that was some other mix-up, wasn't it? A. A relapse from the first.

"Q. Are you sure of that Mr. Broad? A. Yes, sir.

\* \* \*

"Q. Then it was the medicine that caused the relapse, it wasn't this accident, was it? A. Well, it couldn't have been anything else, I am sure. That doctor will know."

After Dr. Gregson had testified, the plaintiff was asked and answered as follows:

"Q. Well, you had some trouble in September of 1933. What was that? A. That was from the relapse, I guess, from the injury.

"Q. What was your condition at that time? Just tell the jury about that. A. Well, right across the small of my back I was pretty sore. When I sat down in a chair I couldn't get up."

The plaintiff did not call Dr. Gregson as a witness, but this physician, as a witness for the defendant, testified that in September he attended the plaintiff in

Good Samaritan hospital, Portland, and that he was suffering from "acute arthritis" caused, in the physician's opinion, by "gonorrheal infection". The first sheet of the hospital charts which were prepared during plaintiff's confinement at that time, and which bears the signature of this witness, states, under the heading of diagnosis, "gonorrheal arthritis". Dr. Gregson swore that the plaintiff was treated for that complaint. An entry upon another page of the chart states, "G. C. eight years ago." Upon rebuttal the plaintiff denied that he had ever been afflicted with that ailment.

The plaintiff stated that after his visit to Gill's office in company with Kelley he returned there "about three or four times afterwards" before he signed the release. He did not testify directly that he failed to read the latter, but swore, "I had no glasses." Apart from declaring that he now possessed glasses, there is no evidence in the record that the plaintiff ever used glasses. In the following testimony in which he refers to Gill, he described the execution of the release:

"A. Well, I had no glasses; my eyes are weak and I had no glasses which I have got now, and I can't read without specs. He says, 'I got the check but I want you to sign the paper here, a formality to the concern in Frisco.' I said, 'You read it Mr. Gill.' I always took great confidence in the man. He said, 'Can't you read yourself?' and I said, No, I haven't got no specs. I am not signing my life away, am I?' and he said, 'No, no, we will take care of you.'

"Q. And did he at that time undertake to tell you what it was, that is to say, as to the character of the instrument? A. Just a formality, or some word to that effect that he used, some high-sounding word—to the headquarters in Frisco.

"Q. And what, if anything, did he say as to what would be done in the future? A. He said he would see that I got compensation as long as I was unable to work.

"Q. How much compensation were they supposed to be paying you, did he tell you? A. $12.48 a week, I think it was.

"Q. Paying you $12.48 for how long? A. I think there was about ten due me but he said he only had eight weeks and he said I would get the remainder later.

"Q. Did he say anything to you at all about paying any other bills for you? A. No, sir.

"Q. Did he remark on the way in which this compensation was being paid, as to what procedure they were following, or any particular thing? A. He didn't say anything to me, only he handed me the check after I signed this paper.

\* \* \*

"Q. Mr. Broad, did you believe and rely on the statements of Mr. Gill to the effect that the signing of this instrument would have nothing to do with your receiving future compensation? A. He told me I would get more.

"Q. And did you believe that? A. Yes, sir, I believe that."

The plaintiff swore that he would not have signed the release had he known of its contents.

Partially across the lower space of the release is a line prepared for the signature. The plaintiff wrote his name fairly upon this line. The check which was handed to him after he had signed the release states in typewriting upon its face in a conspicuous place, "Final", and upon its back is printed the following: "The endorsement of this draft constitutes a release in full payment of the account as stated herein." An inch below this statement is a faint line, apparently prepared for the payee's signature. The plaintiff wrote his name directly upon this line.

Gill and an office assistant denied that any imposition was practiced upon the plaintiff. Both swore that

the plaintiff read the release before he signed it, and that Gill told the plaintiff that it constituted a release of the claim in its entirety.

The question now occurs whether the plaintiff's signature to the release was obtained through deception or overreaching. We have reviewed the evidence at some length for the purpose of indicating the nature and extent of the plaintiff's claim. A settlement of a large and apparently meritorious claim for a few dollars is often deemed evidence of fraudulent conduct. In the present case the plaintiff claims that in his fall he sustained a fracture of the bones of his right arm, that later he had a relapse, and that he was still suffering from the effects of his injury at the time of the trial, approximately three years later. To his first attorney he expressed a willingness to accept $300 in satisfaction of his claim. Two years later when he filed his complaint he was represented by another attorney, and swore in his pleading that he had sustained "severe injuries to his spine, sacrum, right hand and right wrist," but made no mention of a fracture. About a year after the complaint had been filed the cause came to trial with a different attorney appearing for the plaintiff, and then for the first time a fracture was mentioned. In so stating the facts, we intend no reflection upon the attorneys, all of whom were apparently acting in good faith. The purported relapse occurred after the release was signed, and yet the plaintiff does not contend that this alleged happening affects the validity of the release—a contention he surely would have advanced had he actually believed that the illness of September, 1933, was caused by the fall.

■ We believe it is evident that the plaintiff sustained no fracture from his fall upon the defendant's

premises. So far as the record indicates, the plaintiff did not claim that he sustained a fracture while upon the defendant's premises until Dr. Smith, two days before the trial, found evidence of the old fracture. Even then the plaintiff did not swear that any bones were fractured in this accident. He merely swore that he never before had had a broken bone or a cast upon his body, except "on me nose". All of the medical witnesses, even the one called by the plaintiff, make it clear that the fracture, which is shown very clearly in the X-ray photographs, was sustained long before the accident. Only one conclusion is possible: the plaintiff's bones were not broken as result of his fall. Therefore, he is not entitled to receive from the defendant any damages for the fractures shown in the X-ray photographs.

Likewise, we do not believe that the plaintiff presented any evidence that he suffered any "relapse" from the fall. A relapse is a recurrence of a former condition. Reverting to the quoted testimony, it will be observed that the question to which the plaintiff answered "Yes" was in alternative form, and for only one of the alternatives was the plaintiff responsible. His later reply, "A relapse from the first." is equivocal. Finally, after Dr. Gregson had sworn that the plaintiff was suffering from "gonorrheal arthritis" and produced extensive hospital charts showing that he was treated for that ailment and nothing else, the plaintiff "guessed" that his trouble in September, 1933, was the result of his accident. But a guess is not admissible testimony.

It is our belief that the injuries which the plaintiff received upon the defendant's premises consisted of sprains, bruises and a minor laceration, but no injury of a permanent nature. A jury would not have been

warranted in granting him compensation for anything more serious than the disabilities just mentioned. Dr. Hollingsworth testified that on June 22, 1933, when he last saw the plaintiff, the latter, as far as he could determine, had fully recovered from his injuries and was ready to return to his occupation. In other words, his injury had disabled him for four weeks. For that period of disability, together with satisfaction for physical suffering and medical expenses, he was entitled to compensation, if his injury was caused by any negligence of the defendant. The defendant, through its insurer, paid him for eight weeks' disability at the rate of $12.48 per week, together with his medical expenses. Plaintiff's wages are not disclosed by the record. We cannot say that the amount paid was insufficient, and certainly cannot say that the basis upon which the parties determined the amount is evidence of overreaching.

"Ordinarily, courts look with favor upon the settlement of controversies which may lead to litigation": *Peluck v. Pacific Machine & Blacksmith Co.*, 134 Or. 171 (293 P. 417). "Under ordinary circumstances a man is not excused from the consequences of signing a paper which he negligently failed to read": *Foster v. University Lumber Co.*, 65 Or. 46 (131 P. 736). A person is presumed to be familiar with the contents of any document which bears his signature: *Bissett v. Portland Ry. L. & P. Co.*, 72 Or. 441 (143 P. 991).

In *Nielsen v. Portland Gas & Coke Co.*, 76 Or. 505 (147 P. 554), neither the plaintiff nor the defendant's physician who was treating him was aware of the full extent of the plaintiff's injury at the time he accepted $40 as compensation for the injury. Later, a diagnosis by another physician revealed additional and serious injuries. The release was sustained because all had acted in good faith.

The decisions of this court which did not apply the above principles, and which we shall now review, pointed to facts narrated by the plaintiff and his witness which excused him for his failure to have read the paper which it later developed was a release.

In *Vasquez v. Pettit*, 74 Or. 496 (145 P. 1066, Ann. Cas. 1917A, 439), and in *Woods v. Wikstrom*, 67 Or. 581 (135 P. 192), the defendant, who induced the plaintiff to sign the release, was his sympathetic employer. In *Foster v. University Lumber Co.*, 65 Or. 46 (131 P. 736), the individual who obtained the release was president of the defendant corporation with whom the plaintiff had had friendly relations for many years. In the first of these three cases the plaintiff was a Spaniard with a very meager knowledge of our language. In the second, the injury had rendered the plaintiff unconscious for seventeen days and when he regained consciousness he had no knowledge of the cause of his injury. His employer and the latter's son, while calling upon him at the hospital where he was awaiting a second operation, assured him that the accident was an unavoidable one, that he would soon fully recover, and that the defendant would give him a house, spending money, etc. In the third case, the president of the defendant corporation sent to the plaintiff a fraternal brother with assurances that the plaintiff had no valid claim and that he ought to settle. When the plaintiff signed what later turned out to be a release, the president of the defendant corporation handed him $192 contributed by plaintiff's fellow employees, and $200, which the plaintiff thought was a contribution by the defendant.

In *Woods v. Wikstrom*, supra, in *Peluck v. Pacific Machine & Blacksmith Co.*, 134 Or. 171 (293 P. 417),

and in *Franklin v. Webber,* 93 Or. 151 (182 P. 819), the release was signed while the plaintiff was still confined in a hospital, which, as stated in the second of these three decisions, ''is a poor place to transact business''. Besides that fact there was in *Woods v. Wikstrom,* supra, the facts to which we have already adverted. In *Peluck v. Pacific Machine & Blacksmith Co.,* supra, the plaintiff, besides being in a hospital, had only a scant knowledge of the English language, had had no sleep for several days and, according to the decision, was not ''in a physical or mental condition to determine matters vitally affecting his welfare''.

In *Bissett v. Portland Ry. L. & P. Co.,* 72 Or. 441 (143 P. 991), the plaintiff, an eighteen-year-old girl, who was injured in a train wreck, accepted $20 from the defendant's claim agent a few minutes after she was extricated from an overturned car, and while she was too excited to understand the nature of the transaction. She thought that the money was being given to her so that she could reach her destination.

*Olston v. Oregon Water Power & Ry. Co.,* 52 Or. 343 (95 P. 1095, 97 P. 538, 20 L. R. A. (N. S.) 915), which was an action by an administrator to recover damages for his decedent's death, was concerned, in part, with the question whether the representations upon which the plaintiff relied were expressions of opinion or statements of fact. The representations were that defendant's attorney had authorized the agent to tell the plaintiff that for the latter to consult an attorney would be an unjustifiable expense, that the defendant was not liable to the estate, that if the plaintiff brought an action the defendant would keep it in the courts for 10 years, and that the expense of the litigation would amount to more than the recovery. The evidence was held admissible.

In *Wood v. Young*, 127 Or. 235 (271 P. 734), the plaintiff, who had two claims against the defendant, pursuant to the latter's request, called upon a claim adjuster. He discussed with the adjuster only one of the claims, and finally accepted $615, believing that it was satisfaction for the claim he had been discussing. Payment was made to him in the form of a check on the back of which was a release capable of a construction that it covered both claims. The decision affirmed the judgment of the circuit court which applied the release only to the claim which the parties discussed.

In virtually all of these cases the decision commented upon the great disparity between the amount paid and the actual damages which the party sustained.

It will be observed that in none of these cases did the plaintiff have any independent advice—none by an attorney. In at least four of the cases the defendant or his agent gave the plaintiff false advice in regard to his claim. In virtually all of them the plaintiff thought he was signing a receipt, and not a release.

In the instant case, the plaintiff had not been confined at any time in a hospital as a result of his injury. According to his physician, he had been discharged by him as cured a month before he called upon the insurance adjuster. Before signing the release he had had the benefit of the advice of a capable lawyer concerning the nature and size of his claim, including advice to settle for less than $300. No one had given him any misleading information about the nature of his claim, and, as already indicated, the amount he received does not appear disproportionate to the damages incurred. The plaintiff was not adjusting his loss with a sympathetic employer or other person who threw him off his guard, but with a man who made no pretense of being other

than an insurance adjuster. The plaintiff had never known Gill before he came to his office to adjust this loss, and no personal relationship of any kind developed. The plaintiff was not hurried into signing the release as in the Bissett case, nor was the instrument he signed capable of misinterpretation as in the *Wood v. Young* case.

The only feature which this case possesses in common with those reviewed above is the fact that the plaintiff claims that Gill misrepresented the contents of the release. There was no misrepresentation, unless we can find it in the words above quoted, and which we now repeat: "Just a formality—or some word to that effect that he used, * * * some high-sounding word—to the headquarters in Frisco. * * * He said that he would see that I got compensation as long as I was unable to work." It will be observed, however, that Gill made no representation that the instrument contained a promise concerning further compensation, and the declaration under consideration is largely destroyed by the subsequent answer quoted from the plaintiff's testimony in which he said, "He didn't say anything to me, only he handed me the check after I signed this paper," which was his reply to the question, "Did he remark on the way in which this compensation was being paid * * *?"

The paper presented for the plaintiff's signature was in his own hands when the above conversation occurred. At its top, in capital letters, is the word "Release." Anyone capable of signing the release upon the line prepared for the signature, as the plaintiff did, especially anyone capable of signing upon the faint line appearing upon the back of the check, as the plaintiff did, could have had no difficulty in reading this word

"Release." It will be observed that the plaintiff makes no contention that Gill told him that the paper was a receipt, nor does he contend that anyone had to show him where to sign either instrument.

The plaintiff makes no claim that the provisions of the check were misrepresented to him, and yet that instrument in itself constitutes a complete release. Its language was brief and incapable of being misunderstood. Apparently, he experienced no difficulty in reading the amount of the check. As already stated, he did not swear directly that he failed to read the release.

If Gill in any way deceived the plaintiff it was accomplished by stating, in part, that the release was only a formality, but even that designation ought to have indicated to the plaintiff that the instrument possessed significance. When both parties to an agreement are honest and intend to comply with it, they not infrequently state that the matter of signing the paper is a mere formality. We have examined the plaintiff's testimony with care because he approached the issue concerning the release as a badly discredited witness; discredited not only by his own tardy admissions, but also by the telltale bones of his forearm as revealed by the X-ray photographs. We believe that one who shows such willingness to trifle with justice can well be regarded as fully capable of taking care of himself in a settlement.

■ When we said in *Peluck v. Pacific Machine & Blacksmith Co.*, supra, that "courts look with favor upon settlement of controversies which may lead to litigation," we meant it. The significance of those words would be entirely destroyed if we should now hold that, although nothing was done to prevent the plaintiff from reading the release or having it read to

him, he nullified it by saying that Gill told him it was "just a formality". Proof in substantiation of a charge of fraud "should be clear and satisfactory": *Metropolitan Casualty Ins. Co. v. Lesher*, 152 Or. 161 (52 P. (2d) 1133).

■ We conclude that the record contains no substantial evidence in support of the plaintiff's pleading that he was deceived into signing the release.

It follows from the above that the circuit court erred when it sustained the plaintiff's motion for a new trial. The order allowing the new trial is reversed.

BEAN, C. J., and KELLY and BELT, JJ., concur.